# UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| DANIEL ORTIZ,<br><br>                    Plaintiff,<br><br>vs.<br><br>OFFICER TORGENSEN et al.,<br><br>                    Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:17-CV-328 TC<br><br>Judge Tena Campbell |

Plaintiff, Daniel Ortiz, is a *pro se* prisoner proceeding *in forma pauperis.* In this civil-rights complaint, 42 U.S.C.S. § 1983 (2019), he names the following Utah Department of Corrections (UDOC) defendants: Torgensen, Peterson, Pickett, Braithwait, Allred, George, Anderson, Ekkart, Burnham, Dennis, Sorensen and Sylvester.[1] He asserts his federal constitutional rights were violated when Defendants failed to protect him, retaliated against him for filing grievances, and provided inadequate medical care.

Plaintiff was assaulted and injured by other inmates on July 29, 2015. (Doc. No. 47-16.) This assault is the subject of his failure-to-protect claim and the resulting injuries are the subject of his inadequate-medical-care claim.

Defendants move for summary judgment. (Doc. No. 60.) Defendants support their motion with a *Martinez* report (including declarations, medical records, and grievance policy and

---

[1] Plaintiff also named as a defendant "Captain Cultur." This defendant has been identified by the State as Mel Coulter and asserted to have died on January 28, 2017. (Doc. No. 23.) Defendant Coulter's liability is thus not considered further.

history). (*See* Doc. Nos. 46-48.) Plaintiff responds to the motion, with briefing, declarations, and UDOC policy materials, (*see* Doc. Nos. 56, 65, 66, & 68). The Court rules for Defendants.

## SUMMARY-JUDGMENT STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." *Id*. at 56(c)(1). Summary judgment's purpose "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The movant has the "initial burden to demonstrate an absence of evidence to support an essential element of the non-movant's case." *Johnson v. City of Bountiful*, 996 F. Supp. 1100, 1102 (D. Utah 1998). Once movant meets this burden, "the burden then shifts to the non-movant to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of that element." *Id*. To do so, the non-movant must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1999) (citation omitted). In ruling on a summary-judgment motion, this Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Sealock v. Colorado*, 218 F.3d1205, 1209 (10th Cir. 2000).

This Court notified Plaintiff that, in response to a summary-judgment motion, "Plaintiff cannot rest upon the mere allegations in the complaint. Instead . . . Plaintiff must allege specific facts, admissible in evidence, showing that there is a genuine issue remaining for trial." (Doc. No. 17, at 3.) In Plaintiff's response, he did not identify material facts in dispute.

## QUALIFIED IMMUNITY

Defendants' assertion of qualified immunity modifies the summary-judgment review. Asserting qualified immunity, a state employee creates a rebuttable presumption that she is immune from the plaintiff's § 1983 claims. *See Medina v. Cram*, 252 F.3d 1124, 1129 (10th Cir. 2001). And rather than "focus[ing] on the existence of genuine disputes of material fact," the court must "'determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* questions before the court.'" *Spencer v. Abbott*, No. 16-4009, 2017 U.S. App. LEXIS 24668, at *10 n.6 (10th Cir. Dec. 5, 2017) (unpublished) (emphasis in original) (quoting *Cox v. Glanz*, 800 F.3d 1231, 1243 (10th Cir. 2015)).

The qualified immunity analysis has two parts: first, whether, under the facts alleged by the plaintiff, the government officials violated a constitutional right; and second, "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If the plaintiff fails to satisfy either element of his burden, the court must grant the defendant qualified immunity. *See Medina*, 252 F.3d at 1128. When the material facts are not disputed, the question of immunity "is a legal one for the court to decide." *Gomes v. Wood*, 451 F.3d 1122, 1136 (10th Cir. 2006). Such is the case here. Plaintiff fails to show that the government officials

in this case violated his constitutional rights. The Court therefore need not address the "clearly established" prong.

## ANALYSIS

## I. FAILURE TO PROTECT

Plaintiff asserts two claims of failure to protect: (1) that Defendants Anderson and Peterson called him a "snitch" in front of other inmates and that he has consequently since been threatened by other inmates; and, (2) he was assaulted and hurt by rival-gang-member inmates after warning Defendants Torgensen, Peterson, Pickett, Braithwait, Allred and George that the rival gang members were unsecured nearby and a threat to him.

To succeed on a "failure to protect" theory for his Eighth Amendment claims of cruel and unusual punishment, Plaintiff would have to show that Defendants (i) actually knew about an "excessive risk" to his health or safety, *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000), and (ii) were deliberately indifferent to--i.e., consciously disregarded--that risk, *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001).

## A. "Snitch" Allegations

It is undisputed that Plaintiff has not identified a physical harm to him stemming from Defendants Anderson and Peterson allegedly calling him a "snitch." "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ." 42 U.S.C.S. §1997e(e) (2019). This claim is thus dismissed.

## B. Assault Allegations

Defendants challenge Plaintiff's assault claim because he has not exhausted his administrative remedies in the prison grievance system.

### 1. Affirmative Defense Requirements on Summary Judgment

Defendants advancing an affirmative defense--i.e., failure to exhaust administrative remedies--must show that there is no disputed material fact as to any element of the affirmative defense when the evidence is seen in a light most advantageous to the plaintiff. *Kramer v. Wasatch County Sheriff's Office*, 743 F.3d 726, 746 (10th Cir. 2014) (internal quotation marks and citation omitted); *Roberts v. Barreras*, 484 F.3d 1236, 1240 (10th Cir. 2007). When defendants meet this burden, the plaintiff has a duty to cite evidence showing "with specificity the existence of a disputed material fact," *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997), or "show that remedies were unavailable to him as a result of" the actions of prison officials. *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011). Absent either showing, the defendants are entitled to summary judgment on the affirmative defense. *Id.* at 1254. If material facts are disputed, though, summary judgment must be denied. *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014).

Again, on summary judgment, the Court must view the evidence in a light most favorable to Plaintiff. *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001). Evidence, including testimony in declarations, "must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

## 2. Basic Exhaustion Law in Corrections Context

Federal statute requires inmates attacking prison conditions in federal court to exhaust their administrative remedies in the prison grievance system: "No action shall be brought with respect to prison conditions under this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.S. § 1997e(a) (2019).

The Supreme Court holds that exhaustion is not satisfied by filing of an untimely or otherwise procedurally infirm grievance, but must be "proper." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "Proper exhaustion" means "'using all steps the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id*. (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir.2002)) (emphasis in original); *see also Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1112 (10th Cir. 2007) ("Substantial compliance is insufficient."). In *Ngo*, the Supreme Court concedes "this will prevent certain prisoner cases from proceeding, but notes that a 'centerpiece of the PLRA's effort to reduce the quantity . . . of prisoner suits is an "invigorated" exhaustion provision, § 1997e(a).' 'Exhaustion is no longer left to the discretion of the district court, but is mandatory.'" *Tung v. Hartley*, No. 1:08-CV-457-AWI, 2012 U.S. Dist. LEXIS 30895, at *3 (E.D. Cal. Mar. 8) (citations omitted) (ellipses in original). Still, courts must ensure "any defects in exhaustion were not procured from the action or inaction of prison officials." *Aguilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see also Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010) ("Where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust.").

### 3. Applying Law to Facts Regarding Grievances

UDOC's written policy requires grieving inmates to go through each of three levels by certain deadlines to exhaust the administrative process. (Doc. No. 46-5, at 12-14.) Defendants submitted the following documentation of Plaintiff's failure to meet these requirements: a copy of the grievance policy, (Doc. No. 46-5); the inmate grievance coordinator's declaration that she attached to the *Martinez* report "correct and accurate copies of [Plaintiff's] relevant grievance records," (Doc. No. 47-12, at 2); and the fact that none of the grievances attached were filed within the required "seven working days of an incident"--i.e., the assault on July 29, 2015. Defendants have carried their burden to show that Plaintiff did not comply with grievance policy. *Booth*, 532 U.S. at 741 n.6. The burden then shifts to Plaintiff to cite evidence specifically showing there is a disputed material fact.

Plaintiff has two arguments to rebut Defendants' successful assertion of their affirmative defense based on failure to exhaust. First, he points to Grievance # 9908922519, which he fully exhausted. (Doc. No. 47-17, at 2-9.) But there are a couple fatal problems as to that grievance: The Level-One grievance was not filed until October 22, 2015--nearly three months after the assault. That is not even close to the seven working days he had to file his grievance. (Doc. No. 46-5, at 12.) His explanation is that the grievance responders never mentioned that his grievance was filed late, but instead treated the grievance's merits, and so tacitly legitimized his untimeliness. (Doc. No. 65, at 9.)

That leads into the other problem with Grievance # 9908922519, which is that the grievance is actually about the separate issue of alleged retaliation, not failure to protect from the assault. So, the grievance responders would not have thought to deny the grievance as untimely

based on the assault date. Plaintiff indeed mentions the assault in the grievance, but only as it relates to the alleged retaliation. (Doc. No. 47-17, at 2-3.) In the grievance, he gives examples of how he has been retaliated against. One of the incidents he states as "proof" that he was "being targeted" for writing grievances is (in Plaintiff's words) as follows:

> I have written grievences on officers who have harrased me and also on the A-B schedule lockdown. After writting these grievences I get let out of my cell on July 29, 2015, on my A-B lockdown day. I get called to O.M.R. (to discuss my levels being droped after getting found not guilty for a write-up). I wasn't escorted out and no controlled movement was done as they are suppose to. After the Capt. and Lt. argue with me about why I shouldn't get my levels back, I am told to go back to my cell. As soon as I step out of the O.M.R. room two nortenos attack me and I get injured. This was no "accident" or "mistake," why wasn't procedure followed? And how did those guys know I was in O.M.R. and allowed out of their section to wait for me? I now believe this was done on purpose to retaliate on me. After this happened I wrote a grievence to get off the A-B schedule because of this incident, and was told by Lt. Peterson when he handled my grievence that I "had put a huge spotlight on me" and that, "it would go all bad for me if I pursue it." (reffering to my grievence) I am now writing this grievence for retaliation based on the incidents which I have stated here.

(*Id.* at 3.)

So, Grievance # 9908922519 does not get Plaintiff where he wants to be. But it does segue into Plaintiff's second argument rebutting Defendants' affirmative defense. It involves Defendant Peterson allegedly intimidating Plaintiff to keep him from grieving the assault incident. The argument is based solely on Plaintiff's own declarations. He produces no corroborating documents, like grievance copies or even grievance numbers that could be traced.

This is the relevant content of his declaration (in his own words):

> On August 6, 2015 I filed a grievance concerning the incident on July 29, 2015. On August 13, 2015 I met with defendant Roger

8

Peterson, in his office, to address my grievance. During this meeting, defendant Peterson began to intimidate me about resolving this grievance. He began telling me how he took the blame for what happened to me and told me how he had gotten "in trouble" for it. He mentioned that I had brought a huge spotlight, from Draper, to all of Birch staff and to myself, because of my grievance. He stated they were trying to handle 'my incident' in-house but because of my grievance the Draper prison now knows what happened to me. He stated, "People who complain get transferred to a worst place," and brought up an inmate who goes by "Uno," who got moved out of Birch for complaining. I told defendant Peterson that I wasn't trying to cause any trouble and that I just wanted to continue with the grievance process. And then he told me, "It will go all bad for you if you persue it." Because of the defendants words to me and the intimidation, I was compelled to circle the "yes" part of the grievance resolve form, in front of defendant Peterson, so he would see that I "resolved" my issues. I didn't want anything else to happen to me because of me writing this grievance and was scared to continue with it.

On October 10, 2015, a month after my encounter with defendant Peterson "handling" my grievance, I was given two disciplinary write-ups, placed on T.R.O. lockdown and then moved out of Birch housing to a more restrictive housing in Dogwood housing S.M.U. (Severe Management Unit). At this time I filed another grievance on being retaliated on and threatened by defendant Peterson. On this grievance, I again brought up the issue and assault incident of July 29, 2015, and was allowed by the Grievance Coordinator to continue with the Administrative Remedy Process on the issues in this grievance. I was permitted to appeal the Grievance Process and decisions until the Administrative Remedy Process was exhausted. Therefore, all issues pertaining to the assault of July 29, 2015 were exhausted in Grievance # 990892519.

(Doc. No. 56, at 4-5 (signed July 13, 2018).)

This narrative (prepared strictly with an eye to furthering this litigation three years after the assault) is undercut by Plaintiff's assault-contemporaneous, detailed, handwritten account in Grievance # 9908922519 produced by Defendants above:

> After [the assault] happened *I wrote a grievence to get off the A-B schedule because of this incident*, and was told by Lt. Peterson when he handled my grievence that I "had put a huge spotlight on me" and that, "it would go all bad for me if I pursue it." (reffering to my grievence) I am now writing this grievence for retaliation based on the incidents which I have stated here.

(Doc. No. 47-17, at 3 (signed Oct. 21, 2015) (emphasis added).) So it appears that the issue that Plaintiff addressed in the grievance after the assault and discussed in the confrontation with Defendant Peterson was a request to "get off the A-B schedule," *not* Plaintiff's current claim of failure to protect.

Setting aside Plaintiff's wobbly argument that Defendant Peterson deterred him from exhausting a timely grievance about failure to protect from the assault, there is another obstacle to Plaintiff's quest to carry his burden of showing that an issue of material fact jeopardizes Defendants' affirmative defense of exhaustion.

> To the extent plaintiff's argument is that . . . staff threatened or intimidated him into not exhausting his remedies, plaintiff must show: "(1) that the threat or intimidation actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the prison administrative process; and (2) that the threat or intimidation would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the prison administrative process that the inmate failed to exhaust."

*Carbajal v. Keefer*, No. 12-cv-03231-PAB-KLM, 2017 U.S. Dist. LEXIS 159512, at *17-18 (D. Colo. Sept. 27, 2017) (quoting *Tuckel*, 660 F.3d at 1254). So, the timing and volume of grievances filed by Plaintiff after Defendant Peterson's "intimidation" also undermines Plaintiff's contention. *See id*. at *18 (noting after alleged threats and intimidation "Plaintiff filed at least one grievance and alleges that he filed many more").

According to Plaintiff, at the risk of being repetitive:

> On October 10, 2015, a month after my [intimidating] encounter with defendant Peterson "handling" my grievance, I was given two disciplinary write-ups, placed on T.R.O. lockdown and then moved out of Birch housing to a more restrictive housing in Dogwood housing S.M.U. (Severe Management Unit). At this time I filed another grievance on being retaliated on and threatened by defendant Peterson. On this grievance, I again brought up the issue and assaut incident of July 29, 2015, and was allowed by the Grievance Coordinator to continue with the Administrative Remedy Process on the issues in this grievance. I was permitted to appeal the Grievance Process and decisions until the Administrative Remed Process was exhausted. Therefore, all issues pertaining to the assault of July 29, 2015 were exhausted in Grievance # 990892519.

(Doc. No. 56, at 5.) So, not only was Plaintiff not deterred, he was actually emboldened by alleged attempts to intimidate him. Within a month, the intimidation was followed up with some alleged rather harsh retaliation. Still, Plaintiff persevered to file a grievance and follow it to completion. Plaintiff's arguments and evidence thus do not support a conclusion that Defendant Peterson's alleged "threat or intimidation actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the prison administrative process." *Carbajal*, 2017 U.S. Dist. LEXIS 159512, at *18.[2]

The Court concludes that Plaintiff did not exhaust his failure-to-protect claim. Exhaustion is mandatory before an inmate may bring a conditions-of-confinement claim in federal court. The Court therefore grants summary judgment to Defendants Torgensen, Peterson, Pickett,

---

[2] This determination is bolstered by the other grievances included with the *Martinez* report as relevant to Plaintiff's other claims here--i.e., retaliation and inadequate medical treatment. The Court has counted 11 other grievances, at least 8 of which were grieved through to Level Three, filed between October 27, 2015 through May 10, 2016. (Doc. No. 47-17, at 10-65.) These were all within the 10 months following Defendant Peterson's alleged intimidation. And these are only the grievances during the time period that were deemed relevant to the claims here; there may be other grievances filed during the period in question that were deemed irrelevant and were not included. The strong inference to be drawn is that Plaintiff was not deterred by intimidation from filing grievances.

Braithwait, Allred and George on the claim of failure to protect Plaintiff from the assault on July 29, 2015. Because this is the only claim against Defendants Torgensen, Pickett, Braithwaite, Allred and George, they are now dismissed with prejudice from this case.

## II. RETALIATION[3]

### A. Elements of Retaliation Cause of Action

"It is well-settled that '[p]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right [to free speech].'" *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010) (quoting *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990)). To show retaliation, Plaintiff must prove three elements: (1) Plaintiff was involved in "constitutionally protected activity"; (2) Defendants' behavior injured Plaintiff in a way that "would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) Defendants' injurious behavior was "substantially motivated" as a reaction to Plaintiff's constitutionally protected conduct. *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).

### B. Allegations from Complaint

Plaintiff contends that Defendants Peterson, Anderson, and Ekkart violated his First Amendment rights by retaliating against him for filing grievances. More specifically, Plaintiff alleges that he submitted grievances, regarding the July 29th assault, against Defendants Peterson and Anderson. (*Id*. at 8.) The grievances were based on alleged threats and harassment by

---

[3]Plaintiff actually entitled this cause of action, "Retaliation and Conspiracy." However, the "Conspiracy" part appears to have been rather cavalierly used. To successfully state a conspiracy claim, Plaintiff "must specifically plead 'facts tending to show agreement and concerted action.'" *Beedle v. Wilson*, 422 F.3d 1059, 1073 (10th Cir. 2005) (quoting *Sooner Prods. Co. v. McBride*, 708 F.2d 510, 512 (10th Cir. 1983)). Plaintiff has even tried to meet this responsibility; his vague assertions that multiple people were involved in breaching his civil rights, and, therefore, perhaps a conspiracy is involved, are not enough. This claim is thus not considered further.

Peterson and Anderson. He states that Defendant Anderson initiated against him "a false disciplinary charge over a broken cuffport in [his] cell door which [he] was later found not guilty of," then "had [him] moved to another unit confiscating [his] property in the process." (*Id.* at 8.) He goes on to allege that "[a] couple months later [he] was wrongly reassessed and re-classified to a level-two and sent to max-restrictive housing, losing all [his] privileges, phone calls, visiting, commissary and personal property as well as all [his] privilege levels." (*Id.*) He asserts that he "didn't break any rules or do anything to deserve this unfair treatment." (*Id.*)

Other allegations are that "[n]umerous times [he has] also been cell and strip searched, once at 1:15 in the morning, ransacking my cell and confiscating legal papers"; Defendant Ekkart "reads [his] privileged legal mail upon opening the letter and delivering it to me"; and "[o]n April 12, 2016, [he] was transferred from Central Utah Correctional Facility [to] the Utah State Prison and in retaliation I was placed in Uinta 1 . . . los[ing his] personal property (Uinta 1 is a super max and the mental health housing unit)."

Regarding his allegations in the last paragraph, he has not stated a claim upon which relief may be granted.[4] First, he has not identified who searched him, ransacked his cell and

---

[4]    This Court shall dismiss any claims in a complaint filed *in forma pauperis* if they are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief against an immune defendant. *See id.* § 1915(e)(2)(B). "Dismissal of a pro se complaint for failure to state a claim is proper only where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." *Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 806 (10th Cir. 1999). When reviewing the sufficiency of a complaint the Court "presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).

    Because Plaintiff is proceeding *pro se* the Court must construe his pleadings "liberally" and hold them "to a less stringent standard than formal pleadings drafted by lawyers." *Id.* at 1110. However, "[t]he broad reading of the plaintiff's complaint does not relieve [him] of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Id.* While Plaintiff need not describe every fact in specific detail, "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Id.*

    The complaint must clearly state what each individual defendant did to violate Plaintiff's civil rights. *See Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976) (stating personal participation of each named defendant

confiscated his legal papers, nor has he alleged a timeline for those activities. He has also not identified who transferred him to Utah State Prison. This does not allow him to successfully trace these activities to a retaliatory motive against any defendant, let alone the named defendants. In short, he has not made clear "exactly *who* is alleged to have done" the what (searches). *Stone*, 2009 U.S. App. LEXIS 15944, at 4 ) ("To state a claim, a complaint must 'make clear exactly *who* is alleged to have done *what* to *whom*.'"). These incidents under the retaliation claims are thus not considered further.

As for Defendant Ekkart, Plaintiff does not give the slightest hint that she had any way to even know about his history of grievances (Plaintiff's involvement in "constitutionally protected activity"), let alone retaliate against him for them. Plaintiff has left her completely unlinked to any of the other allegations and defendants so that she appears in the complaint as a random addition with no background or context. Defendant Ekkart is thus not considered further.

The Court now moves onto the allegations against Defendants Peterson and Anderson.

### C. Allegations against Peterson and Anderson

The Court jumps right to the dispositive third element of retaliation. *See Ellis v. Franco*, No. CIV 15-0848, 2017 U.S. Dist. LEXIS 108683, at *19 (D.N.M. July 12, 2017) (report & recommendation), *adopted by* 2017 U.S. Dist. LEXIS 127320 (Aug. 10, 2017). This order will next consider whether (based on the undisputed material facts) Defendants' behavior (i.e., denying privileges, moving Plaintiff to more restrictive housing and confiscating property) was substantially motivated by a wish to deter Plaintiff's grievance filings.

---

is essential allegation in civil rights action). "To state a claim, a complaint must 'make clear exactly *who* is alleged to have done *what* to *whom*.'" *Stone v. Albert*, No. 08-2222, 2009 U.S. App. LEXIS 15944, at *4 (10th Cir. July 20, 2009) (unpublished) (emphasis in original) (quoting *Robbins*, 519 F.3d at 1250).

## D. Undisputed Material Facts

• Before July 29, 2015, Plaintiff wrote grievances "on officer who ha[d] harassed [him] and also on the A-B schedule lockdown." (Doc. No. 47-17, at 3.)

• "A cuff port is for use in doors where inmates are on both sides of the door moving to and from housing units and other areas of the prison." (Doc. No. 48-5, at 2.)

• On July 28, 2015, Plaintiff kept opening a cuff port lock, "jimmying the lock, and generally not following orders." (*Id*. at 2-3.)

• On July 29, 2015, Plaintiff went to O.M.R. "to discuss [his] levels being dropped after getting found not guilty for a write-up." (Doc. No. 47-17, at 3.)

• In Plaintiff's own words, he declared the following uncontested account:

> On August 6, 2015 I filed a grievance concerning the [assault] incident on July 29, 2015. On August 13, 2015 I met with defendant Roger Peterson, in his office, to address my grievance. During this meeting, defendant Peterson began to intimidate me about resolving this grievance. He began telling me how he took the blame for what happened to me and told me how he had gotten "in trouble" for it. He mentioned that I had brought a huge spotlight, from Draper, to all of Birch staff and to myself, because of my grievance. He stated they were trying to handle 'my incident' in-house but because of my grievance the Draper prison now knows what happened to me. He stated, "People who complain get transferred to a worst place," and brought up an inmate who goes by "Uno," who got moved out of Birch for complaining. I told defendant Peterson that I wasn't trying to cause any trouble and that I just wanted to continue with the grievance process. And then he told me, "It will go all bad for you if you persue it." Because of the defendants words to me and the intimidation, I was compelled to circle the "yes" part of the grievance resolve form, in front of defendant Peterson, so he would see that I "resolved" my issues. I didn't want anything else to happen to me because of me writing this grievance and was scared to continue with it.

(Doc. No. 56, at 4-5.)

• In August 2015, Defendant Anderson became a sergeant in the Birch Housing Unit where she came to know Plaintiff and his grievance history. (Doc. No. 48-2, at 2.)

• Before October 10, 2015, Plaintiff had not filed a grievance regarding Defendant Anderson. (Level 2 Response to Plaintiff Grievance, Doc. No. 47-17, at 7 (dated Dec. 2, 2015).)

• On October 10, 2015, Plaintiff, a known Sureno gang member, was found out of bounds in another cell "with another known gang member." (*Id*. at 5, 11.) At that time, Plaintiff "and a group of inmates were congregated and singing songs by an inmate's cell . . . in the Birch housing unit." (Doc. No. 65-2, at 6.) Plaintiff was put "on [Temporary Restriction Order (TRO)] by the shift commander." (Doc. 47-17, at 5, 11; Doc. No. 65-2, at 6.) TRO consists of "a 'temporary' lockdown and loss of privileges for up to 18 working days." (Doc. No. 65-2, at 6.) At his "T.R.O. interview . . . [Plaintiff] was specifically told by [Defendant] Peterson that 'because of [Plaintiff's] grievance the captain was no longer working there' and that [Defendant Peterson] also 'got in a lot of trouble' and 'got a lot of heat over it.'" (Plaintiff's Grievance Form, Doc. No. 47-17, at 2-3 (Oct. 22, 2015).) "Due to the nature of the incident and issues with active gang members it was decided to place the out of bounds inmates on TRO for safety and security of the institution." (*Id*. at 14.) "On October 10, 2015 . . . [Plaintiff] was given two disciplinary write-ups, placed on T.R.O. lockdown and then moved out of Birch housing to a

more restrictive housing in Dogwood housing S.M.U. (Severe Management Unit)." (Doc. No. 56, at 4-5.) One reason Plaintiff was moved out of Birch was that he had "stated in previous grievances he was afraid of Birch staff retaliating against him." (Doc. No. 47-17, at 33.)[5]

• On October 15, 2015, Plaintiff had a TRO interview. (*Id*.) In the interview, Defendant Anderson reprimanded Plaintiff for requesting a grievance form on October 10 and said, "'You complain too much, I don't want you in my [Birch] housing unit.'" (*Id*.) And, Defendant Peterson stated, "'You know, the captain isn't working here in Birch any longer because of your grievance.'" (*Id*.) Plaintiff was moved out of Birch housing. (*Id*. at 36.)

• This uncontested account is from a memo to Grievance Coordinator, from Birch OMR:

> On 10/29/2015 Ortiz was transferred to the Draper facility because of an attempted suicide. This is a main concern of giving Ortiz much of his property back because of the nature of what he might

---

[5] Plaintiff swears in a declaration to support his retaliation claim:

> I was the only person who was transferred out of Birch housing for the "out-of-bounds" write ups which were given on October 10, 2015. [Plaintiff's cellmate Cruz who was also found out of bounds was not] moved as I was, therefore I was treated differently from the other inmates. I have never heard or seen another inmate be transferred out of Birch housing for an out of bounds write up.

(Doc. No. 65-2, at 7.)

Meanwhile, in Cruz's declaration also attached to Plaintiff's memorandum in opposition to Defendants' summary-judgment motion, Cruz states:

> Me and Ortiz were the only ones singled out and placed on lockdown. . . . I was upset cause me and Ortiz were being treated differently because inmates are not regularly placed on T.R.O. lockdown for a simple 'out of bounds' write-up. I have never seen this happen before. . . . After our T.R.O. interview our T.R.O. lockdown was extended and we were both moved out of Birch housing to S.M.U.

(Doc No. 65-4, at 3.)

Thus, Plaintiff's own evidence contradicts Plaintiff's declaration that he was singled out to be treated differently from others as retaliation. Plaintiff's evidence instead shows that Plaintiff and Cruz were treated similarly regarding their misbehavior. Because Plaintiff was not "the only inmate transferred out of Birch . . . to more restrictive housing," this evidence is not the "clear indicator that [Plaintiff was] being targeted in retaliation for writing a grievance" that Plaintiff argues it was. (Doc. No. 66, at 2.)

> use it for. Ortiz returned to CUCF on 11/05/2015 a c-note was
> placed in his file for him to be placed in a security cell until CUCF
> mental health staff can see him and determine his status. Upon
> completion of this response Ortiz has been moved to a new
> housing unit where he has received all his property.

(*Id.* at 14.)

• On November 9, 2015, Plaintiff was put back in "regular housing" or "general population." (*Id.* at 15.)

• On December 15, 2015, Plaintiff complained he was "in danger from Sureno Inmates and Inmate Green because [Plaintiff] did not want to be a gang member"--essentially "report[ing] safety concerns." (*Id.* at 41-42.) In response, Plaintiff was temporarily "placed on TRO and reassessed . . . to be a Level 2 classification." (*Id.*) The reassessment considered the number of times Plaintiff was on TRO in 2015 and whether he held a job and engaged in programming and education during the last twelve months. (*Id.* at 42.) As a Level 2, Plaintiff could "not have . . . the property listed on confiscation form dated January 8, 2016." (*Id.* at 41) Another inmate who was with Plaintiff being moved to Hickory housing at that same time also had his property taken and "reviewed by the staff to see if [he had] any contraband or unauthorized property," acknowledging "this property gets inventoried and what policy allows we are able to take with us." (Doc. No. 65-6, at 3.)

### E. "But-For" Motivation

"[I]t is not the role of the federal judiciary to scrutinize and interfere with the daily operations of a state prison." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). Thus, "to satisfy the third prong of the First Amendment test, an inmate must allege specific facts showing that '*but for* the retaliatory motive, the incidents to which he refers . . . would not have

taken place.'" *Banks v. Katzenmeyer*, 645 F. App'x 770, 772 (10th Cir. 2016) (emphasis added) (quoting *Peterson,* 149 F.3d at 1144 (internal quotation marks omitted)). This is a "heightened standard" that requires Plaintiff to show "a triable issue not only that retaliation for [filing of grievances] played a role in [denying privileges, moving Plaintiff to more restrictive housing and confiscating property] but that such retaliation was the decisive factor." *Strope v. McKune*, 382 F. App'x 705, 710 (10th Cir. 2010) (unpublished); *see also Smith,* 899 F.2d at 949 (stating plaintiff must "prove that the actual motivating factor behind defendants' actions was retaliation for his prior or current litigation"); *Strope v. Cummings*, 381 F. App'x 878, 884 (10th Cir. 2010) (unpublished) ("Keeping in mind the rigorous burden placed on Strope to show not only that a retaliatory motive may have played some role in his transfer but that such a motive was the strict but-for cause of his transfer, we conclude that he has failed to make the necessary showing on this element to defeat summary judgment, i.e., his evidence was 'merely colorable' at best and not 'significantly probative.'") (citations omitted). Therefore, it was critical to Plaintiff in avoiding summary judgment that he provide evidence detracting from Defendants' alternative justifications for moving Plaintiff to more restrictive housing with fewer privileges and personal property allowances. *See McKune*, 382 F. App'x at 710.

For example, Defendants argue, based on their evidence, that the move out of Birch by Defendant Peterson on October 10, 2015, was made because Plaintiff "went out of bounds." (Doc. No. 60, at 39 (citing ORT000023).)

Plaintiff did present some evidence to undermine Defendants' alternative justifications. *See id*. For instance, he quoted Defendant Peterson saying that bad things happen to inmates who grieve. Still, his "attribution of retaliatory motive is . . . conclusory" at bottom. *Cummings*, 381

F. App'x at 883; *see also Banks*, 645 F. App'x at 774 n.2 ("A plaintiff's subjective beliefs about why the government took action, without facts to back up those beliefs, are not sufficient to create a genuine issue of fact concerning [a] First Amendment retaliation claim." (internal quotation marks and citation omitted) (alteration in original)); *Ellis*, 2017 U.S. Dist. LEXIS 108683, at *21 ("An inmate's mere speculation that actions taken by correctional officials were in retaliation for the exercise of his First Amendment rights cannot defeat summary judgment.") While he very well did file grievances, that by itself does not provide the required nexus for his retaliation claim. *See id*. "If it did, litigious prisoners could claim retaliation over every perceived slight and resist summary judgment simply by pointing to their litigiousness." *Id*. Of course, Plaintiff was not inoculated from standard conditions of confinement simply because he was filing grievances. *See id*. The Tenth Circuit has "consistently held that temporal proximity between protected activity and a challenged prison action does not, in itself, demonstrate the causal nexus for a retaliation claim." *Id*. Plaintiff did argue time correlation and he has produced undisputed facts that Defendants Peterson and Anderson stated that his propensity to file grievances was a reason for moving him.

Still, Defendants' explanations for their actions carry the day. Plaintiff has not shown that strictly "but for" a retaliatory motive Defendants would not have moved him to more restrictive housing with its consequent loss of privileges and property confiscation. *Banks*, 645 F. App'x at 772. He may even have shown that retaliation for filing grievances played a role in moving Plaintiff to more restrictive housing but he failed to show "that such retaliation was the decisive factor." *Strope*, 382 F. App'x at 710.

Defendants gave their reasons, supported by the evidence, for sometimes moving Plaintiff to more restrictive housing (with its consequent restrictions on privileges and property): On October 10, 2015, Plaintiff was found out of bounds (Plaintiff admits this). (Doc. No. 65-2, at 6.) Plaintiff's own concern with retaliation by Birch staff was a reason to move him out of Birch as well, (Doc. No. 47-17, at 33); in other words, it was partly for Plaintiff's own perceived protection from alleged retaliation. On October 29, 2015, Plaintiff was moved and his property taken because of his attempted suicide. (Doc. No. 47-17, at 14.) When such issues were not of concern, such as on November 9, 2015, several days after Plaintiff's move due to his suicide attempt, Plaintiff was put back in "general population." (Doc. No. 47-17, at 15.) The latter definitely undercuts his argument that the decisive factor in his moves was retaliation. After all, the move back to general population was during the time period when he alleged retaliation was the motive for his moves. Later, after Plaintiff himself notified UDOC staff that he was "in danger," he was moved as a safety precaution, which triggered a review of his classification and a move to Hickory. (Doc. No. 47-17, at 41-42.) This move was initiated by Plaintiff himself, admittedly to avoid perceived danger where he was. And confiscation of property along with the move to Hickory was, by Plaintiff's own evidence, "what policy allows." (Doc. No. 65-6, at 3.) He was not singled out; he was treated like other inmates according to established policy.

Even if Plaintiff firmly believes and is right that Defendants did not follow UDOC's procedures to the letter, any possible isolated mistakes are not an actionable basis for a free speech claim. *See id*. Even if Plaintiff firmly believes that the timing of the grievance submissions and housing moves were closely tied together and could arouse suspicion that the events were correlated, "temporal proximity per se is insufficient to show that the stated

explanation for a challenged action is pretextual." *Id.*; *see also Smith v. Drawbridge*, No. CIV-16-1135-HE, 2017 U.S. Dist. LEXIS 175923, at *27 (W.D. Okla. Sept. 8, 2017) (report & recommendation) (stating "'suspicious timing,' without more, is insufficient to support a reasonable inference that these actions" were taken because Plaintiff exercised constitutional rights), *adopted by* 2017 U.S. Dist. LEXIS 175014 (Oct. 23, 2017). Defendants "have come forward with reasons for essentially every action taken against [Plaintiff]." *Northington v. Zavaras*, No. 99-1184, 2000 U.S. App. LEXIS 19113, at *10 (10th Cir. August 10, 2000) (unpublished).

Plaintiff's retaliation claims against Defendants Peterson and Anderson fail due to his lack of evidence showing that, but-for a motive of retaliation regarding Plaintiff's exercise of his First Amendment rights, Defendants would not have moved him to more restrictive housing, with its consequent reduction of privileges and property allowance. Plaintiff has not shown that Defendants violated his constitutional rights here; Defendants are thus entitled to qualified immunity on these claims.

### III. INADEQUATE-MEDICAL-TREATMENT CLAIMS

The claims here are based on Plaintiff's circumstances after he was hurt in the assault on July 29, 2015. (Am. Compl., Doc. No. 36-1, at 4.) During the following months, he sought treatment from UDOC medical personnel.

The defendants named here are Burnham, Dennis, Sorensen, and Sylvester. The deprivations that Plaintiff alleges are as follows:

(1) Defendants Burnham and Dennis "did not treat [Plaintiff's] injuries (neck and broken hand/finger) in a timely manner making [him] suffer with no pain medication other than ibuprofen." (Doc. No. 36-1, at 7.)

(2) After two physical therapy sessions, further sessions were canceled by Defendant Burnham because Defendants Sorensen and Sylvester refused to escort Plaintiff to a physical therapy appointment due to Plaintiff being locked down on the "A&B day schedule." (*Id*.)

Plaintiff alleges that these deprivations have caused him ongoing physical symptoms of pain and decreased functionality.

### A. Legal Standards

The Eighth Amendment's ban on cruel and unusual punishment requires prison officials to "provide humane conditions of confinement" including "adequate . . . medical care." *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998)) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998)). To state a cognizable claim under the Eighth Amendment for failure to provide proper medical care, "a prisoner must allege acts or omissions *sufficiently harmful* to evidence deliberate indifference to serious medical needs." *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (emphasis in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Any Eighth Amendment claim must be evaluated under objective and subjective prongs: (1) "Was the deprivation sufficiently serious?" And, if so, (2) "Did the officials act with a sufficiently culpable state of mind?" *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

Under the objective prong, a medical need is "sufficiently serious . . .if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay

person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209 (citations and quotation marks omitted).

The subjective prong requires Plaintiff to show that prison officials were consciously aware that he faced a substantial risk of harm and wantonly disregarded the risk "by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). "'[I]nadvertent failure to provide adequate medical care' tantamount to negligence does not satisfy the deliberate indifference standard." *Sparks v. Singh*, 690 F. App'x 598, 604 (10th Cir. 2017) (unpublished) (quoting *Estelle*, 429 U.S. at 105–06). Further, "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Perkins v. Kan. Dep't of Corrs.,* 165 F.3d 803, 811 10th Cir. 1999); *see also Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010) (stating disagreeing with doctor's particular treatment method, without more, does not rise to level of Eighth Amendment violation).

Delay in receiving treatment is cognizable only if the delay was caused by deliberate indifference and resulted in substantial harm. *Olson,* 9 F.3d at 1477. "[I]n the context of a missed diagnosis or delayed referral, there must be direct or circumstantial evidence that 'the need for additional treatment or referral to a medical specialist is obvious,'" and "'where a doctor merely exercises his considered medical judgment,'" no deliberate indifference exists. *Sparks*, 690 F. App'x at 604 (quoting *Self v. Crum*, 439 F.3d 1227, 1231-32 (10th Cir. 2006)).

## B. Undisputed Material Facts[6]

• At relevant times, Plaintiff was housed in Utah's state prison system, where Defendant Burnham was a medical doctor and supervised Defendant Dennis, who was a physician assistant (PA). (Doc. 47-4, at 2.)

• 7/29/15 - Plaintiff was injured in an assault. (Doc. No. 47-18, at 174.) He was seen by a nurse that very day. (*Id*. at 181.) Defendant Burnham did not see him that day but orally advised use of ice for swelling and "authorize[d] Ibuprofen 800 mg for pain" for three days. (Doc. No. 47-4, at 2; Doc. No. 47-18, at 6, 172.) Plaintiff was told to "submit [Inmate Care Request (ICR)] if he notices any worsening in his condition or if he sees any new injury arise" and Plaintiff "verbalized understanding of instructions." (Doc. No. 47-18, at 182.)

• 7/30/15 - Plaintiff "submitted an [ICR] for all [his] pain and discomfort." (Doc. No. 65-2, at 2.)

• 7/31/15 - Defendant Dennis saw Plaintiff for "mandibular angle pain, following an altercation." (Doc. No. 48-4, at 2.) Neither Dennis nor "dental" (a dentist had examined Plaintiff the day before) found a fracture. (*Id*.; Doc. No. 47-18, at 174.) Plaintiff did not complain of hand or neck pain. (Doc. No. 48-4, at 2.) Plaintiff asked for "opioid pain medication," which Dennis denied in favor of "Ibuprofen 800mg." (*Id*. at 2-3; Doc. No. 47-18, at 6.) Dennis ordered an x-ray of Plaintiff's jaw. (Doc. No. 48-4, at 3; Doc. No. 47-18, at 2.) When Dennis found out that Plaintiff had also mentioned his sore right hand, Dennis also authorized a hand x-ray. (Doc. No. 48-4, at 3.) The hand x-ray showed "healing of old/previous fractures" but "[n]o acute Fx." (*Id*.) Dennis noted that Plaintiff had already been authorized for a liquid diet with his regular meal tray. (*Id*.; Doc. No. 47-18, at 6, 168.)

---

[6] The only facts set forth here regard those claims to which Plaintiff has affirmatively linked defendant(s). Any other allegations irrelevant to named defendants are not considered.

• 8/5/15 - Plaintiff submitted "another [ICR] concerning [his] injuries. (Doc. No. 65-2, at 3.)

• 8/6/15 - Dr. Stillwell of University Health Care (UHC) reported hand x-ray results: "No acute fracture." (Doc. No. 47-19, at 2.)

• 8/7/15 - Defendant Dennis saw Plaintiff again for "significant pain when chewing and with motion of the head, causing daily headaches." (Doc. No. 48-4, at 3.) Dennis's examination revealed improved range of motion. (*Id*.) Still, based on Plaintiff's pain complaints, Dennis allowed instant breakfast for another week. (*Id*.; Doc. No. 47-18, at 158.) Dennis again denied Plaintiff's demands for opiates, ordering instead "12 IB." (Doc. No. 48-4, at 3-4; Doc. No. 47-18, at 160.) Dennis also noted, "X rays are apparently neg but waiting for radiology report." (Doc. No. 47-18, at 162.)

• 9/27/15 - Plaintiff submitted an ICR about his hand and neck pain and discomfort. (Doc. No. 65-2, at 3.)

• 9/30/15 - To follow-up on the July 29, 2015 assault, Defendant Dennis saw Plaintiff for pain in his right hand, fourth and fifth fingers, and neck. (Doc. No. 48-4, at 4.)  Dennis noted residual hand swelling. (*Id*.) Dennis ordered another hand x-ray and prescribed "Naproxen 500mg" and physical therapy (PT). (*Id*. at 4, 6, 149.) The x-ray showed the same old injuries for which "no intervention was indicated." (*Id*. at 4.)

• 10/6/15 - Defendant Dennis's PT order was assigned to Bohn Bales. (*Id*. at 3, 149.)

• Defendant Dennis's overall opinion of his three visits with Plaintiff is that examinations and observations, together with x-ray results, "were inconsistent with significant injury." (*Id*. at 5.) Though Plaintiff repeatedly asked for opiates, Dennis "saw no justification for any medication stronger than NSAIDs." (*Id*.)

• 10/7/15 - At Defendant Dennis's request, Dr. Honey of UHC filed a report about the hand x-rays on which several old injuries were seen. (Doc. No. 47-19, at 8.)

• 10/19/15 - Plaintiff missed a PT appointment. (Doc. No. 65-2, at 4.)

• 11/2/15 - Plaintiff had a PT appointment, where his neck's range of motion was measured and he received "moist heat with tens to the neck and upper traps 20 minutes." (*Id*. at 107.) He "was instructed in active rom exercises for the neck, to be done slowly, to tolerance, 2-3 times each day." (*Id*.)

• 11/9/15 - Plaintiff had a PT appointment, where his neck's range of motion was measured and he received "moist heat with tens to the neck and upper traps 20 minutes." (*Id*. at 91.) He also received education on a plan that he could do "twice daily." (*Id*.)

• 11/16/15 - Plaintiff did not attend his PT appointment due to "snowy road conditions" and was rescheduled. (*Id*. at 89.)

• 11/23/15 - Plaintiff "did not arrive in the [PT] department" and was rescheduled." (*Id*. at 88.) Plaintiff had not been told of the appointment. (*Id*. at 4.)

• 11/30/15 - Plaintiff "again did not arrive in the PT department." (*Id*. at 84.) Bales entered a note that Plaintiff would "not be rescheduled." (*Id*.) Plaintiff was supposed to be transported to the PT appointment by Defendants Sylvester and Sorenson, but was told by Sylvester that the appointment had been canceled. (*Id*. at 4.)

• The reason Plaintiff's PT was canceled after two visits "was because of no-shows to appointments." (*Id*.) None of the no-shows were Plaintiff's fault. (*Id*.)

• Defendants Sorenson and Sylvester were not in positions to make decisions about whether PT will be provided to an inmate. (Doc. No. 47-13, at 3; Doc. No. 47-14, at 3.)

• 3/8/16 - Plaintiff "submitted another Inmate Care Request [ICR] because of the pain and complications which [he] was still having in [his] neck and . . . dysfunctional right hand finger which [he] could not bend anymore or make a full fist on." (Doc. No. 65-2, at 5.)

• 3/10/16 - Upon examining Plaintiff who reported his neck and hands were still giving him "a lot of discomfort and pain," Defendant Burnham ordered an x-ray of Plaintiff's spine. (*Id*. at 2, 59.) Defendant Burnham noted that Plaintiff's hand injury was "mallet finger," which showed healing and no treatment necessary. (*Id*. at 60.)

• 3/16/16 - X-ray done and "showed some possible effects of muscle spasm." (*Id*. at 56.) Report was filed by Dr. Rassner of UHC as to "3 views cervical spine." (Doc. No. 47-19, at 9.)

• 3/17/16 - Regarding consult due to "neck pain since assaulted july 2015," Defendant Burnham ordered an MRI. (*Id*. at 55-56.) Burnham stated Plaintiff would not receive further PT but that, after the MRI, Plaintiff would "receive another follow up to see what to do about [his] neck." (Doc. No. 65-2, at 5.)

• 4/27/16 - Report by Dr. Stilwill on "C-spine MRI" done by UHC on Defendant Burnham's order. (*Id*. at 52; Doc. No. 47-19, at 4.)

• 5/22/17 - Plaintiff submitted an ICR. (Doc. No. 65-2, at 5.) Defendant Burnham saw him for his neck pain and gave him a "cervical pillow." (*Id*.)

### c. Applying Law to Facts

As to the allegations against Defendants Sorenson and Sylvester, the Court sees no liability. On these undisputed facts, they played the minor role of transporting Plaintiff to PT appointments. They had no authority as to whether Plaintiff would go to PT or not. Their role was ministerial. It was ultimately up to Defendant Burnham and PT provider Bohn whether

Plaintiff would have further PT appointments. They are the ones responsible for cutting off PT. Still, Plaintiff had been taught some exercises in his two PT appointments and could presumably use that education to continue to improve his pain and mobility.

And, as to the allegations against Defendants Burnham and Dennis, the Court concludes that they did not provide inadequate medical care. Based on the undisputed facts--supported by over two hundred pages of medical records and declarations that the Court has thoroughly reviewed--this Court cannot possibly term Defendants to be deliberately indifferent to Plaintiff's injuries from the assault. To the contrary, Defendants either met with Plaintiff themselves, or arranged for Plaintiff to be treated by another medical provider (e.g., UMC specialist or physical therapist), thirteen times during an eight-month period at issue here. That averages out to a medical encounter every eighteen days. At each visit, active treatment of some kind took place-- i.e., prescriptions and medical equipment were authorized and dispensed; specialists were called upon; radiology tests were done; therapy was provided. And this is only as to these two defendants. Plaintiff's medical records included in the *Martinez* report show that he was also treated by other doctors, PAs, nurses, and mental health providers during that period and beyond, each leaving notes as to symptoms, observations, and treatments to be carried out.

Far from "deliberate indifference"--"the unnecessary and wanton infliction of pain"-- the record over many sick visits shows Defendants (and other medical providers) ensuring treatment for the injuries *every time* Plaintiff asked. *Estelle*, 429 U.S. at 104 (quotation marks & citation omitted). It may not have been the exact medication or dosage or other treatment that Plaintiff wanted, but the medical care was uniformly adequate in that Plaintiff's expressed need for help

with pain and injury was consistently met by Defendants. Plaintiff disputes this, but his allegations are entirely unsupported.

Plaintiff's point really is that he, as an unqualified layperson, wanted more or different treatment from the medical professional defendants--not, as it must be shown to prevail, that Defendants, with full knowledge of the deleterious effects of their actions or inactions, outright ignored or even exacerbated Plaintiff's serious medical needs (assuming Plaintiff's needs were serious). *Id.*. at 107 (stating that, when inmate contended "that more should have been done by way of diagnosis and treatment" and "suggest[ed] a number of options that were not pursued, that was "classic example of a matter for medical judgment . . . and does not represent cruel and unusual punishment"). As a matter of law, Defendants' treatment of Plaintiff, as it is set forth in undisputed evidentiary submissions, simply cannot be said to "offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.*. at 106.

Thus, under the qualified immunity analysis, Plaintiff has not shown that the government officials violated a constitutional right. They therefore are entitled to qualified immunity. And, the inadequate-medical-care claims against Defendants Burnham, Dennis, Sorensen and Sylvester are dismissed.

## CONCLUSION

**IT IS ORDERED** that:

(1) Plaintiff's motion to amend his complaint is **GRANTED**. (Doc. No. 36.) This was unopposed by Defendants and used as the basis for the litigation from the date the motion was filed. (Doc. No. 38.)

(2) Plaintiff's motion to compel discovery is **DENIED**. (Doc. No. 41.) The subsequent *Martinez* report process rendered this request unnecessary. (Doc. Nos. 46-48.)

(3) Plaintiff's motion for appointed counsel is **DENIED**, (Doc. No. 49), for the same reasons his original motion for appointed counsel, (Doc. No. 12), was denied, (Doc. No. 33.)

(4) Defendants' Motion for Summary Judgment is **GRANTED**. (Docket No. 60.) With no controversy remaining in this Court, this action is **CLOSED.**

DATED this 27th day of March 2019.

BY THE COURT:

JUDGE TENA CAMPBELL
United States District Court