IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DANIEL ORTIZ,<br><br>Plaintiff,<br><br>v.<br><br>SARAH TORGENSON, et al.,<br><br>Defendants. | **ORDER AND MEMORANDUM DECISION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:17-cv-328-TC<br><br>Judge Tena Campbell |

In his amended complaint (ECF No. 105), Plaintiff Daniel Ortiz asserts violations of his civil rights under 42 U.S.C. § 1983. This court previously granted summary judgment to all defendants in this action (ECF No. 70), but that decision was vacated by the Tenth Circuit as it related to the retaliation claim against two defendants from the Utah Department of Corrections (UDOC): Sgt. Heather Anderson and Lt. Roger Peterson. (ECF No. 103.) On remand, the court appointed counsel for Mr. Ortiz (ECF No. 104) and the parties engaged in further discovery. This discovery included a variety of UDOC records, the deposition of Mr. Ortiz, and the depositions of the remaining defendants, Sgt. Anderson and Lt. Peterson. (See ECF Nos. 119, 139.)

Sgt. Anderson and Lt. Peterson now move for summary judgment a second time, asserting the affirmative defense of qualified immunity.[1]  (ECF No. 120 at 30–33.[2])  They contend they did not violate Mr. Ortiz's clearly established constitutional rights (id. at 30–57), "creat[ing] a presumption that [they] are immune from suit[.]"  Truman v. Orem City, 1 F.4th 1227, 1235 (10th Cir. 2021) (cleaned up).  Their argument shifts the burden to Mr. Ortiz to show otherwise.  See Sawyers v. Norton, 962 F.3d 1270, 1282 (10th Cir. 2020).

Having thoroughly reviewed all the parties' arguments and evidence, the court concludes that the qualified immunity defense shields Sgt. Anderson and Lt. Peterson from further litigation in this matter.

## PROCEDURAL HISTORY

On remand, the sole remaining issue in this matter is Mr. Ortiz's assertion that Sgt. Anderson and Lt. Peterson retaliated against him because he exercised his First Amendment right to free speech by filing grievances about his assault by other inmates on July 29, 2015.  (ECF No. 105 at 2, 4, 6.)

Mr. Ortiz alleges that Sgt. Anderson retaliated against him by: 1) filing "a false disciplinary charge"; 2) telling him "that she did not want [him] in her housing unit"; 3) having him "moved to another unit [and] confiscating [his] property"; and 4) telling other inmates that

---

[1] Sgt. Anderson and Lt. Peterson moved to withdraw the arguments they made in their first motion for summary judgment (see ECF No. 145), and the court granted that motion (see ECF No. 146).

[2] Unless otherwise stated, record citations are to PDF pages rather than internal document pages.

he "was a 'snitch' working for the guards."[3]  (Id. at 4, 8.)  He alleges that Lt. Peterson retaliated

against him by: 1) causing him a "loss of privileges and a move/transfer to another more

restrictive housing"; and 2) "spread[ing] the rumor to inmates that [he] was a 'snitch' for the

guards, deliberately placing [him] in danger."  (Id. at 2.)

> The Tenth Circuit framed the remaining issue as follows:

> Ortiz says he received unusually harsh discipline [i.e., temporary-restriction-order
> (T.R.O.) lockdown and then transfer to special management unit (SMU)] for an
> out-of-bounds charge arising on October 10, 2015.  Ortiz believes Anderson and
> Peterson imposed more severe discipline than they normally would have because
> they wanted to punish him for his grievances, and particularly for complaining
> about the July 29 incident.

Ortiz v. Torgenson, 857 F. App'x 419, 428 (10th Cir. 2021).[4]  The Tenth Circuit then cautioned:

"This assumes, of course, that Peterson or Anderson (or both) caused Ortiz to be placed in

---

[3] Mr. Ortiz also alleges: "Sgt. Anderson acted in concert with Lt. Peterson to deliberately
endanger Plaintiff's life."  (ECF No. 105 at 4.)  The court has already disposed of this possible
conspiracy claim as follows:

> Plaintiff actually entitled this cause of action, "Retaliation and Conspiracy."
> However, the "Conspiracy" part appears to have been rather cavalierly used.  To
> successfully state a conspiracy claim, Plaintiff "must specifically plead 'facts
> tending to show agreement and concerted action.'"  Beedle v. Wilson, 422 F.3d
> 1059, 1073 (10th Cir. 2005) (quoting Sooner Prods. Co. v. McBride, 708 F.2d
> 510, 512 (10th Cir. 1983)).  Plaintiff has not even tried to meet this responsibility;
> his vague assertions that multiple people were involved in breaching his civil
> rights, and, therefore, perhaps a conspiracy is involved, are not enough.  This
> claim is thus not considered further.

(Mem. Decision & Order Granting Mot. for Summ. J., ECF No. 70 at 12 n.3.)

[4] Other allegations under the retaliation heading—which were not affirmatively linked to any
named defendants—have already been dismissed for failure to state a claim upon which relief
may be granted:

> "Numerous times [Plaintiff has] also been cell and strip searched, once at 1:15 in
> the morning, ransacking [his] cell and confiscating legal papers"; Defendant
> Ekkart "reads [his] privileged legal mail upon opening the letter and delivering it
> to [him]"; and "[o]n April 12, 2016, [he] was transferred from Central Utah

T.R.O. lockdown or sent to the SMU (or both)."  <u>Id.</u> at 431 (citing <u>Stidham v. Peace Officer</u> <u>Standards & Training</u>, 265 F.3d 1144, 1156–57 (10th Cir. 2001) (holding § 1983 plaintiff must show each defendant's liability for constitutional deprivation—i.e., show affirmative links between each defendant's actions and a constitutional violation)).

Arguing that further discovery has shown they were not responsible for any allegedly retaliatory charges, decisions, or injuries, Sgt. Anderson and Lt. Peterson seize upon the Tenth Circuit's statement and urge the court to conclude they are immune from further litigation regarding the retaliation claim.  (ECF No. 120 at 9.)

## LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court "look[s] at the factual record and the reasonable inferences to be drawn from the record in the

---

Correctional Facility [to] the Utah State Prison and in retaliation … was placed in Uinta 1 … los[ing his] personal property (Uinta 1 is a super max and the mental health housing unit).

(ECF No. 70 at 13 (quoting ECF No. 105 at 8).)  Likewise, the following allegations are not affirmatively linked to any named defendants: "A couple of months later [after Sgt. Anderson gave Mr. Ortiz a false disciplinary charge over a broken cuffport, Mr. Ortiz] was wrongly reassessed and re-classified to a level two and sent to max-restrictive housing, losing all [his] privileges, phone calls, visiting, commissary and personal property as well as all of [his] privilege levels."  (ECF No. 105 at 8.)  Further, these allegations do not match up to any of the allegations discussed by the parties in the current summary judgment proceedings. (ECF No. 120; Pl.'s Mem. in Opp'n to Mot. for Summ. J., ECF No. 139; Defs.' Reply to Mot. for Summ. J., ECF No. 144.)  These allegations are therefore also dismissed for failure to state a claim upon which relief may be granted.

light most favorable to the non-moving party." <u>Self v. Crum</u>, 439 F.3d 1227, 1230 (10th Cir. 2006).

"Once the moving party has identified a lack of a genuine issue of material fact, the nonmoving party has the burden to cite to specific facts showing that there is a genuine issue for trial." <u>May v. Segovia</u>, 929 F.3d 1223, 1234 (10th Cir. 2019) (cleaned up).  "Those specific facts must be supported by particular parts of materials in the record; relying on mere pleadings is insufficient." <u>Id.</u> (cleaned up).  "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." <u>Self</u>, 439 F.3d at 1230 (cleaned up).  "When some contradictory evidence exists, the basic summary judgment question is whether a reasonable jury could find for the nonmovant on the disputed issue." <u>Ortiz</u>, 857 F. App'x at 421; <u>see</u> <u>Helvie v. Jenkins</u>, 66 F.4th 1227, 1232 (10th Cir. 2023) ("In the ordinary case … a plaintiff can survive summary judgment by establishing genuine issues of material fact that a jury must decide.").

## II. Qualified Immunity

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>City of Tahlequah v. Bond</u>, 595 U.S. 9, 12 (2021) (per curiam) (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)).  It means to shelter "all but the plainly incompetent or those who knowingly violate the law[,]" <u>id.</u> (cleaned up), giving "government officials breathing room to make reasonable but mistaken judgments about open legal questions." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 743 (2011).  Two important interests are balanced by the doctrine of qualified immunity: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment,

5

distraction, and liability when they perform their duties reasonably." <u>Pearson</u>, 555 U.S. at 231. Questions of qualified immunity should be resolved at the earliest feasible stage of litigation. <u>Anderson v. Creighton</u>, 483 U.S. 635, 646 n.6 (1987).

When the qualified immunity defense is raised, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." <u>T.D. v. Patton</u>, 868 F.3d 1209, 1220 (10th Cir. 2017) (citation omitted).  "A defendant is entitled to qualified immunity if the plaintiff fails to satisfy either prong." <u>Valdez v. Macdonald</u>, 66 F.4th 796, 831 (10th Cir. 2023).  And courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case[.]" <u>Pearson</u>, 555 U.S. at 236.

Where a defendant government official invokes a qualified immunity defense at summary judgment, "[the Tenth Circuit] accepts as true the facts that the plaintiff can support with evidence and then asks whether the plaintiff has shown 1) that the defendant violated the plaintiff's federal rights, and 2) that the violation was clearly established at the time the incident at issue occurred." <u>Helvie</u>, 66 F.4th at 1232; see <u>Est. of Taylor v. Salt Lake City</u>, 16 F.4th 744, 756 (10th Cir. 2021) (stating that a plaintiff can overcome a defendant's assertion of qualified immunity only by showing "the defendant violated [the plaintiff's federal] … rights, <u>and</u> … that the right was clearly established at the time of the alleged unlawful activity").

## UNDISPUTED MATERIAL FACTS FOR THIS ORDER ONLY

1.      From June 2, 2015, to July 29, 2015, and from August 3, 2015, to October 15, 2015, Mr. Ortiz was housed in "Birch," a general population unit at Central Utah Correctional

Facility (CUCF).  (UDOC Location History List Report, ECF No. 119-5 at 1; <u>see</u> Dep. Heather

Anderson, ECF No. 119-21 at 10–11 (describing Birch unit).)  From October 15, 2015, to

October 30, 2015, Mr. Ortiz was housed in CUCF's Dogwood unit.  (ECF No. 119-5 at 1.)

       2.      In 2015, Lt. Peterson was a CUCF lieutenant in Birch, who supervised sergeants

and was supervised by a captain.  (Dep. Roger Peterson, ECF No. 119-22 at 4, 8, 10; ECF No.

139 at 6.)  Lt. Peterson felt frustrated when inmates filed grievances rather than coming to talk to

him more informally about an issue.  (ECF No. 119-22 at 20–21.)  Lt. Peterson understood

retaliation to mean: "To deny an inmate something that he's earned or he has a right to."  (<u>Id.</u> at

23.)

       3.      Sgt. Anderson was a housing sergeant, supervising officers in prisoner housing

units.  (ECF No. 119-21 at 12–13.)  In August or September of 2015, she was transferred to

Birch.  (<u>Id.</u> at 36–37.)  During the relevant time, Lt. Peterson was Sgt. Anderson's supervisor at

Birch.  (<u>Id.</u> at 25.)  Anderson has "experienced frustration towards an inmate."  (<u>Id.</u> at 24.)

       4.      At the relevant time, "to keep members of different gangs separate," CUCF used

"an A/B … system."  (ECF No. 119-22 at 28.)  The two gangs involved were Norteños and

Sureños, the latter of which included Mr. Ortiz and his cellmate, Robert Cruz.  (Decl. Robert

Cruz, ECF No. 65-4 at ¶ 1.)  One gang would be assigned A days and the other B days on which

to leave their cells for programming and other reasons.  (<u>See</u> <u>id.</u>; <u>see also</u> ECF No. 119-22 at 28–

30.)

       5.      **July 29, 2015 assault.**  On July 29, 2015, Mr. Ortiz was called to an offender

management review (OMR) hearing attended by Lt. Peterson, even though it was Mr. Ortiz's off

day—in other words, "a day that [Mr. Ortiz] would normally be in his cell" on the A/B schedule.

(ECF No. 119-22 at 36.)  As he left the Birch hearing room, Plaintiff was assaulted and injured by rival gang members.  (See UDOC Incident Report 300505, ECF No. 47-16 at 4; Decl. Daniel Ortiz, ECF No. 56 at ¶¶ 6–8; ECF No. 65-4 at ¶¶ 2–3; ECF No. 119-22 at 34–35.)  Sgt. Anderson was not involved with the incident.  (ECF No. 119-21 at 36–37; Dep. Daniel Ortiz, ECF No. 119-23 at 10:16–18; ECF No. 139 at 7 (responding "Undisputed" by Mr. Ortiz).)

6.    **Grievance 990891701 (about the July 29 assault).**  On August 10, 2015, Mr. Ortiz filed a grievance about inadequate medical care for his injuries from the assault.  (See UDOC record, ECF No. 119-10.)  Though Mr. Ortiz wanted to appeal when the grievance was denied, Lt. Peterson met with him and shamed him, saying: "What are you doing, bringing a big spotlight on us?  Because of the grievance, Draper is looking at us"; "[Y]ou cause attention … [a]nd … people who cause attention, they get moved [and lose privileges;] [y]ou want to get moved from Birch?"; "it will go all bad … if [Mr. Ortiz] pursued it"; and Lt. Peterson lost "pay over it."  (ECF No. 56 at ¶ 10; ECF No. 119-23 at 17, 23–24; Dep. Daniel Ortiz, ECF No. 139-1 at 17:3–20, 23:17–19.)  Lt. Peterson said that, because of Mr. Ortiz's grievance, Lt. Peterson had been blamed and gotten "in trouble."  (ECF No. 56 at ¶ 10; ECF No. 119-23 at 23.)  Mr. Ortiz took these statements "as a threat," choosing not to appeal to "please [Peterson]" and "because [he] didn't want to get retaliated on" and "wanted to stay [in Birch] because it was a good housing unit [with privileges] and [he] had a good cellmate."  (ECF No. 119-23 at 17–18, 23, 36.)

7.    **Grievance management.**  For some of Mr. Ortiz's grievances, Lt. Peterson did fact finding and spoke to those involved.  (ECF No. 119-22 at 17.)  Lt. Peterson interviewed Mr. Ortiz about his grievance "against the Birch housing staff who took [Mr. Ortiz's] hot pot and …

electronics and … didn't give it back" to Mr. Ortiz.  (ECF No. 119-23 at 55.)  Lt. Peterson also

informally warned Mr. Ortiz about filing frivolous and malicious grievances, which Mr. Ortiz

characterized as Lt. Peterson coming by to "yell[] at me a couple times."  (Id. at 54–56.)  Sgt.

Anderson did not process or decide grievances, but she sometimes wrote memoranda about

incidents involving her, and she sometimes researched grievance subject matter.  (ECF No. 119-

21 at 17, 74–75.)

       **8.**      **The out-of-bounds violation.**  On October 10, 2015, Mr. Ortiz and Mr. Cruz

were observed by an officer walking into another inmate's cell, in violation of prison rules.

(UDOC Ortiz Grievance Record, ECF No. 119-2 at 12, 32–34.)  The officer alerted Sgt.

Anderson, who used a speaker to ask Mr. Ortiz and Mr. Cruz to exit.  (Id. at 34; ECF No. 119-21

at 43–44.)  Mr. Ortiz and Mr. Cruz both left the cell.  (ECF Nos. 119-2 at 34; 119-21 at 44; 119-

23 at 25.)  Sgt. Anderson signaled for the section to "rack in" to their cells.  (ECF Nos. 119-2 at

34; 119-21 at 43.)

       **8a.**      Mr. Ortiz and Mr. Cruz were charged with an out-of-bounds violation.  (See

UDOC incident report, ECF No. 119-9 at 11; see also ECF No. 139 at 14 (showing "Undisputed"

by Mr. Ortiz).)  Sgt. Anderson did not file the charge; instead, the officer who first observed the

violation did, with Sgt. Anderson adding a narrative about what happened.  (ECF Nos. 119-21 at

44; 139 at 14 (showing "Undisputed" by Mr. Ortiz).)

       **8b.**      Mr. Ortiz and Mr. Cruz were put on T.R.O. "by the on-duty Captain, not by

Anderson."[5]  (ECF Nos. 120 at 23; 139 at 15; see ECF No. 119-21 at 46; see also ECF No. 119-

---

[5] This sentence was part of the Defendants' summary judgment motion section titled
"UNDISPUTED MATERIAL FACTS," set forth in full as follows:

**8d.**     On October 15, 2015, there was a Birch Offender Management Review (OMR)

meeting that included a T.R.O. interview with Mr. Ortiz, at which both Sgt. Anderson and Lt.

Peterson were present and during which they discussed Mr. Ortiz's grievances. (ECF Nos. 119-

15; 119-23 at 45–46.)  Sgt. Anderson stated that Mr. Ortiz "complain[ed] too much" and said she

did not want him in Birch.  (ECF No. 119-23 at 46.)  Lt. Peterson also mentioned the grievance

that arose out of the July 29 assault.  (Id. at 45–46.)  The interview was overseen by a captain, as

a captain takes charge of OMR meetings.  (ECF No. 139 at 17, 20–21 (showing "Undisputed" by

Mr. Ortiz).)[6]  Mr. Ortiz stated, "[T]hey were trying to have me admit to us drinking in there," but

Mr. Ortiz told Sgt. Anderson: "We weren't drinking.  We were just singing and just having fun."

(ECF No. 119-23 at 46.)  Mr. Ortiz's T.R.O. was extended an extra fifteen days, which meant

"mov[ing] … out of Birch" and into the SMU, which has more restrictions than "main

population" and varying usages, including punishment.  (Id. at 29, 46–47; ECF Nos. 119-2 at 17;

119-21 at 67, 71; 119-22 at 56–57 (describing SMU).)  Mr. Ortiz had "never seen them put

anybody on TRO for [an] out-of-bounds write-up my whole prison stay … [of] over ten years."

(ECF No. 119-23 at 35.)  Mr. Cruz said, "I have never seen this happen before."  (ECF No. 65-4

at ¶ 9.)

**8e.**     On October 19, 2015, there was a disciplinary hearing on the out-of-bounds

charge, and the hearing officer, Michele Finlayson, found Mr. Ortiz guilty of the violation and

"assess[ed]" him 10 days of punitive isolation.[7]  (ECF No. 119-9 at 11.)  All told, Mr. Ortiz

---

[6] Mr. Ortiz stated that the following people were at the hearing: "It was Sergeant Anderson,
Lieutenant Peterson, the captain, Culter, and Braithwaite."  (ECF No. 119-23 at 45.)
[7] Mr. Ortiz responded: "Partially disputed.  Ortiz ended up spending 30 days in the Severe
Management Unit with lockdown restrictions that included confinement to his cell and
confiscation of his hot pot and electronics."  (ECF No. 139 at 17.)  In his response, Mr. Ortiz did

spent "about a month of TRO [or SMU] time," with his hot pot and electronics confiscated. (ECF No. 119-23 at 47, 55.)  Mr. Cruz was also moved out of Birch, remaining "on T.R.O. lockdown for over 30 days."  (ECF No. 65-4 at ¶ 9.)

  **8f.** A Birch OMR memorandum dated November 10, 2015, indicates Mr. Ortiz was "a known [Sureño] gang member[,]" and that his "going into the cell with another known gang member … brought suspicion."  (ECF Nos. 119-2 at 17; 119-19 (listing Mr. Ortiz's security threat group (stg) as Sureño).)  The memo suggests that issues with active gang members necessitated T.R.O. until staff could detect what had occurred in the cell.  (See ECF No. 119-2 at 17.)

  **8g.** At a Level III hearing on grievance number 990892558, on December 23, 2015, the hearing officer, Steven Turley, pointed out that Mr. Ortiz was put on T.R.O. by the "Shift Commander," not by Sgt. Anderson.  (ECF No. 119-2 at 12.)[8]

---

not deny or contest that it was "the hearing officer, who was not Peterson or Anderson," who "found Ortiz guilty of the violation and assessed him" this particular 10 days in punitive isolation.  (Id. (emphasis added)).  The court therefore finds that it is undisputed that it was "the hearing officer, who was not Peterson or Anderson" who held this disciplinary hearing, found Mr. Ortiz guilty, and "assess[ed]" him 10 days of punitive isolation.

[8] Mr. Ortiz partially disputes Sgt. Anderson and Lt. Peterson's characterization of the Level III hearing.  In the section titled, "UNDISPUTED MATERIAL FACTS," Sgt. Anderson and Lt. Peterson set forth the following:

> 17.  The grievance was denied, and Ortiz appealed to Levels II and III.  At Level III the hearing officer, who was not Anderson or Peterson, pointed out that Ortiz was put on T.R.O. by the "Shift Commander" and not by Anderson.  Also, the hearing officer found that Ortiz was "engaging in vindictive and harassing behavior towards Sgt. Anderson because she is female," pointing out derogatory language he had used against her.

(ECF No. 120 at 26.)  Mr. Ortiz responded:

> Partially disputed.  Anderson took part in the T.R.O. interview in which she told Ortiz that he "complain[ed] too much [through grievances]" and that she did not

**9.**     **Cuff port write-up.**  The same day as the out-of-bounds violation, an incident involving Mr. Ortiz's cuff port arose.  (UDOC incident report, ECF No. 119-4 at 20.)  A cuff port is a security device on a cell door that opens on hinges and is unlocked from the outside. (ECF No. 119-21 at 54.)  Sometimes inmates tinker with a cuff port to keep it from locking. (Id.)

**9a.**     After Mr. Ortiz and Mr. Cruz were placed on T.R.O., Sgt. Anderson locked the cuff port on their cell, checked it for its security, and then returned to the control room.  (ECF No. 119-9 at 8; ECF No. 139 at 18.)  Mr. Ortiz had told Sgt. Anderson the cuff port was faulty, which she acknowledged, entering a work order to have it repaired.  (ECF No. 119-23 at 42–43.)

**9b**.     Staff then noticed the cuff port had been reopened, though Mr. Ortiz states he had not handled the cuff port in any way.  (Id. at 41, 43–44.)  Sgt. Anderson saw Mr. Ortiz crouched down, with his face in the open cuff port.  (ECF No. 119-21 at 58–59.)  Sgt. Anderson closed the cuff port again. (ECF Nos. 119-9 at 8; 119-21 at 55.)  Still, Mr. Ortiz asserts that he had not handled the cuff port in any way.  (ECF No. 119-23 at 44 ("I didn't handle it but I was written up regardless.").)

**9c.**     Sgt. Anderson went off shift but told the oncoming shift that she had warned Mr. Ortiz to keep the cuff port closed (though Mr. Ortiz had not handled the cuff port in any way). (ECF No. 119-2 at 9–10, 31, 34; ECF No. 119-23 at 44.)

---

want him in Birch.  Ortiz Depo. 46:2-5.  Ortiz never used any derogatory language towards Anderson.  Ortiz Depo. 51:21-52:19.
(ECF No. 139 at 18.)

**9d.** During night shift, a control-room officer saw Mr. Ortiz's cuff port open and Mr. Ortiz talking through it to another inmate. (ECF Nos. 119-2 at 31; 119-9 at 14; 119-21 at 56.) The officer called into the cell and told Mr. Ortiz to close the cuff port, reminding him not "to mess with it again." (ECF No. 119-9 at 14.) Mr. Ortiz said he had bumped it and it had opened. (Id.)

**9e.** "Ortiz was written up for the violation by a staff member on the night shift, not Anderson." (ECF No. 139 at 19 (showing "Undisputed" by Mr. Ortiz); see ECF Nos. 119-9 at 15; 119-21 at 56; 119-23 at 42.) Mr. Ortiz denied handling the cuff port, saying the cuff port was broken and "any inmate could have just opened it from the outside." (ECF No. 119-23 at 43.)

**9f.** Lt. Peterson was involved with the cuff port incident because he reviewed and approved the report.[9] (ECF Nos. 119-22 at 85; Peterson Dep., ECF No. 139-3 at 9.)

**9g.** "Later, a hearing officer dismissed the violation based on 'the elements of the charge, content of the officer's report and further investigation to verify the inmate's testimony.'" (ECF No. 139 at 20 (showing "Undisputed" by Mr. Ortiz); see ECF Nos. 119-9 at 16; 119-23 at 42–43.)

**10. Snitch-calling.** During Mr. Cruz's interview, Lt. Peterson stated "that Ortiz had snitched and had confessed that [Mr. Ortiz and Mr. Cruz] were drinking prison brew" and that

---

[9] Defendants stated the following as an undisputed fact: "Peterson was not involved with this incident other than to review and approve the report." (ECF No. 120 at 24.) And Mr. Ortiz responded that this fact is "[d]isputed," asserting, "Peterson took part in the T.R.O. interview." (ECF No. 139 at 19–20.) But it appears that the interview referred and cited to is the T.R.O. hearing regarding the out-of-bounds charge. (ECF Nos. 139-1 at 10–11 (distinguishing between the incident rendering the T.R.O. hearing and the cuff port incident); 139-3 at 9 (discussing cuff port incident).)

"Ortiz was working with [prison staff] and that Ortiz had told on [the other inmates], that [they] were breaking the rules and drinking 'hooch.'"  (ECF Nos. 65-4 at ¶ 10; 119-23 at 48.)  Mr. Ortiz said, "Cruz confronted me about it.  He's all like, 'Why did you say that if we weren't doing that?'  And I said, 'I never said that.'"  (ECF No. 119-23 at 48.)  Sgt. Anderson "intentionally" told other inmates that Mr. Ortiz "was a 'snitch' working for the guards."  (ECF No. 105 at 4.)

## ANALYSIS

Because Sgt. Anderson and Lt. Peterson assert that they are entitled to qualified immunity, Mr. Ortiz bears the burden to show that the Defendants transgressed his clearly established federal constitutional rights.  See City of Tahlequah, 595 U.S. at 11.

### I. Prong One: Breach of Constitutional Right

Mr. Ortiz contends that Sgt. Anderson and Lt. Peterson violated his First Amendment rights by retaliating against him for filing grievances.  (ECF No. 105 at 8.)

"It is well-settled that '[p]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his [constitutional] right[s.]'"  Gee v. Pacheco, 627 F.3d 1178, 1189 (10th Cir. 2010) (quoting Smith v. Maschner, 899 F.2d 940, 947 (10th Cir. 1990)). "In particular, [the Tenth Circuit has] found that officials may not retaliate against a prisoner for filing administrative grievances."  Allen v. Avance, 491 F. App'x 1, 5 (10th Cir. 2012) (citing Williams v. Meese, 926 F.2d 994, 998 (10th Cir. 1991)).  "This principle applies even where the action taken in retaliation would be otherwise permissible."  Ortiz, 857 F. App'x at 428–29 (quoting Smith, 899 F.2d at 948).  To show retaliation, Mr. Ortiz must prove each of three elements: 1) he was involved in "constitutionally protected activity"; 2) the Defendants' behavior injured him in a way that "would chill a person of ordinary firmness from continuing to engage

in that activity"; and (3) the Defendants' injurious behavior was "substantially motivated" as a reaction to his constitutionally protected conduct.  Shero v. City of Grove, 510 F.3d 1196, 1203 (10th Cir. 2007).

As the Tenth Circuit noted, crucial to this analysis is the question of whether Sgt. Anderson or Lt. Peterson caused Mr. Ortiz to be put in T.R.O. lockdown or sent to SMU (or both).  See Ortiz, 857 F. App'x at 431 (citing Stidham, 265 F.3d at 1156–57 (holding that in a § 1983 action, a plaintiff must allege and prove each defendant's liability for constitutional deprivation—i.e., a plaintiff must allege and prove affirmative links between each defendant's actions and the constitutional violation)).

As set forth below, the court finds that Mr. Ortiz has not met his burden on this question because he fails to allege facts supported by evidence that it was the behavior of Sgt. Anderson and Lt. Peterson—rather than other decisionmakers—that injured him in a way that "would chill a person of ordinary firmness from continuing to engage in that activity."  Shero, 510 F.3d at 1203.

**A.  Threats Made by the Defendants**

Before turning to the central question on remand, the court first addresses whether either the threats made by Sgt. Anderson and Lt. Peterson or the allegations that they accused him of snitching, without more, rise to the level of a constitutional violation.

Mr. Ortiz presents undisputed facts supporting his allegation that the Defendants threatened him for exercising his constitutional right to file grievances.  Lt. Peterson made the following two statements: 1) "[Y]ou cause attention … [a]nd … people who cause attention, they get moved [and lose privileges;] [y]ou want to get moved from Birch?"; and 2) "[I]t will go all

16

bad … if [Mr. Ortiz] pursued [the grievance]."  (ECF No. 56 at ¶ 10; ECF No. 119-23 at 17, 23–
24; ECF No. 139-1 at 17:3–20, 23:17–19.)  And Sgt. Anderson told Mr. Ortiz: "You complain
too much," a statement Mr. Ortiz said was "about my grievance[,]" explaining "that she don't
want me in the housing unit … because I complained too much."  (ECF No. 119-23 at 46.)
Later, when Lt. Peterson interviewed Mr. Ortiz about his grievance against Birch staff "who took
[his] hot pot and … electronics and … didn't give it back to [him]," (id. at 55), Lt. Peterson
informally warned Mr. Ortiz against filing frivolous and malicious grievances, warnings which
Mr. Ortiz characterized as Lt. Peterson coming by to "yell[] at me a couple times."  (Id. at 54–
55.)

       But after surveying Tenth Circuit caselaw, the court finds that these threats alone do not
rise to the level of a constitutional violation.  In Vreeland v. Vigil, No. 1:18-CV-3165-PAB-
SKC, 2020 U.S. Dist. LEXIS 48731 (D. Colo. Feb. 11, 2020) (R. & R.), adopted by 2020 U.S.
Dist. LEXIS 47570 (Mar. 19, 2020), a plaintiff averred that defendants "threatened to have [him]
transferred to a different level 3 or higher security facility if [he] submitted any more grievances
or law suits against them." Id. at *29–30. Concluding plaintiff had not plausibly stated a
retaliation claim, the court noted,

> The Tenth Circuit has found that verbal harassment alone is insufficient to state a
> claim for unconstitutional retaliation.  Requena v. Roberts, 893 F.3d 1195, 1211–
> 12 (10th Cir. 2018) ("To the extent [plaintiff's] retaliation claim is based on
> [defendant] calling him a 'dumb Indian,' harassing him 'all night' while in
> segregation, and placing him on 'nutraloaf' without following proper procedure,
> such actions alone, although unprofessional and unpleasant, do not constitute
> adverse action sufficient to support a retaliation claim."); see also McDowell v.
> Jones, 990 F.2d 433, 434 (8th Cir. 1993) ("[V]erbal threats and name calling
> usually are not actionable under § 1983.").
>
> Claim Nine merely alleges that [defendants] … "threatened to have [plaintiff]
> transferred to a different level 3 or higher security facility if [he] submitted any

> more grievances or law suits against them." There are no additional threats, or more importantly, <u>corresponding adverse actions</u>, alleged in the proposed SAC to plausibly state a retaliation claim.

<u>Id.</u> at. *30–31 (emphasis added).

And in <u>Montgomery v. Raemisch</u>, No. 18-cv-02911, 2019 U.S. Dist. LEXIS 84908, at *8 (D. Colo. May 20, 2019), the defendant said to the plaintiff, "Since you like filing complaints I'll come back and fuck with you some more, so watch out." <u>Id.</u> But aside from "this verbal threat," there were no allegations that the defendant "ever took any adverse actions towards [the p]laintiff." <u>Id., at *13.</u> The court therefore concluded that the plaintiff had not validly alleged that the defendant's verbal threat caused him "an injury that would chill a person of ordinary firmness from continuing to engage in that activity." <u>Id.</u>[10]

---

[10] <u>See also</u> <u>Buchanan v. Johnson Cnty. Sheriff's Dep't</u>, No. 19-3114, 2019 U.S. Dist. LEXIS 127527, at *7–8 (D. Kan. July 31, 2019) (concluding no valid retaliation claim when defendant verbally attacked plaintiff including saying "stop filing grievances" (citing <u>Davis v. Goord</u>, 320 F.3d 346, 353 (2d Cir. 2003) (concluding "insulting, disrespectful, or sarcastic comments directed at inmate 'do not, without more, constitute an adverse action'" for stating retaliation claim))); <u>Johnson v. Doe</u>, No. 17-cv-2379, 2018 U.S. Dist. LEXIS 230591, at *15–16 (D. Colo. Jan. 16, 2018) (stating when defendant allegedly tried to keep plaintiff from filing grievances "by starting a yelling match about filing grievances" that "verbal argument is not the sort of injury that would chill a person of ordinary firmness from engaging in constitutionally protected activity"); <u>Powell v. Laurie</u>, No. 16-3251, 2017 U.S. Dist. LEXIS 127523, at *12 (D. Kan. Aug. 11, 2017) (concluding plaintiff failed to state retaliation claim when only "adverse 'action' is a threat" and recognizing "trivial or de minimis injury, or a complete lack of injury … will not support a § 1983 retaliation claim"); <u>Richards v. Stafford</u>, No. CIV-15-216-R, 2016 U.S. Dist. LEXIS 94713, at *6 (W.D. Okla. June 23, 2016) (rejecting retaliation claim when, in reaction to plaintiff's grievance, defendant "threatened curtailment of Plaintiff's use of the grievance process," reasoning refusal to give inmate grievance form is not "type of injury that would chill a person of ordinary firmness from exercising their constitutional right" (quoting <u>Fogle v. Infante</u>, 595 F. App'x 807, 810 (10th Cir. 2014)), <u>adopted by</u> 2016 U.S. Dist. LEXIS 93662 (July 19, 2016).

### B.  Accusations of Snitching

Concerning snitching, (a) Lt. Peterson told Mr. Cruz "that Ortiz had snitched and had confessed that [Mr. Ortiz and Mr. Cruz] were drinking prison brew" and that Mr. Ortiz "was working with [staff] and that Ortiz had told on" the prisoners who "were breaking the rules and drinking 'hooch,'" (ECF Nos. 65-4 at ¶ 10; 119-23 at 48); and (b) Sgt. Anderson "intentionally" told other inmates that Mr. Ortiz "was a 'snitch' working for the guards," (ECF No. 105 at 4). But these allegations—that Sgt. Anderson and Lt. Peterson retaliated against Mr. Ortiz by telling other inmates that Mr. Ortiz was a snitch—do not include any tangible injury caused by Sgt. Anderson and Lt. Peterson.  (Id.; ECF No. 119-23 at 48.)  The court therefore finds that the statements made about snitching do not alone rise to the level of a constitutional violation.

### C.  Move to More Restrictive Housing

But in this matter, Mr. Ortiz alleges that he suffered adverse actions that went beyond mere threats concerning his grievances and accusations of snitching—namely, Mr. Ortiz argues that he was moved to more restrictive housing with fewer privileges because he filed grievances.

The Tenth Circuit reversed this court's previous finding that Mr. Ortiz failed to "prove that 'but for' the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place."  See Smith, 899 F.2d at 949–50.  Finding that the "basic question is whether Anderson or Peterson, or both, imposed an allegedly harsher punishment than normal for an out-of-bounds charge—i.e., T.R.O. lockdown and then transfer to the SMU— because they wanted to punish Ortiz for filing grievances[,]" and reviewing the evidence in the light most favorable to Mr. Ortiz, the Tenth Circuit held: "On balance, however, we believe that a reasonable jury could still find that, but for a desire to punish Ortiz for his grievances, Peterson

and Anderson would not have disciplined him as harshly." Ortiz, 857 F. App'x at 430–31. Nevertheless, the Tenth Circuit also cautioned that a finding of retaliation "assumes, of course, that Peterson or Anderson (or both) caused Ortiz to be placed in T.R.O. lockdown or sent to the SMU (or both)." Id. (citing Stidham, 265 F.3d at 1156–57).

After careful review of the facts developed through discovery on remand, the court finds that Mr. Ortiz has not demonstrated that it was either Sgt. Anderson or Lt. Peterson who made the decision to place him on T.R.O. lockdown or transfer him to SMU.  In every instance, it was someone else who filed charges and made the ultimate decisions.

The following facts are undisputed: Sgt. Anderson did not file the out-of-bounds charge; rather, the officer who first saw the violation did.  (ECF Nos. 119-9 at 9–10; 119-21 at 44; 139 at 14.)  Mr. Ortiz was placed on T.R.O. by on-duty Captain Huber, not by Sgt. Anderson.  (ECF Nos. 119-9 at 8–9; 119-21 at 45–46; 119-23 at 28; 139 at 15.)  And when Birch OMR extended Mr. Ortiz's T.R.O. by fifteen days, the T.R.O. interview was overseen by a captain.  (UDOC C Notes, ECF No. 119-15 at 1; ECF No. 139 at 16, 20–21).  Four days later, during the out-of-bounds disciplinary hearing, Officer Finlayson—not Sgt. Anderson or Lt. Peterson—found Mr. Ortiz guilty and assessed him "10 days [of] punitive isolation."  (ECF Nos. 119-9 at 11; 139 at 17.)  Finally, Mr. Ortiz was written up for the cuff port violation by a staff member on the night shift, not by Sgt. Anderson; and this charge resulted in a not-guilty finding, with no allegation or evidence of a disciplinary consequence for Mr. Ortiz.  (ECF Nos. 119-21 at 56; 119-23 at 42–43; 139 at 20.)

The most involvement that Sgt. Anderson and Lt. Peterson had in a disciplinary decision occurred at the T.R.O. interview on October 15, 2015.  The court assumes for the purposes of

20

this order that both Sgt. Anderson and Lt. Peterson made disparaging comments about Mr. Ortiz's grievances at that interview and that Sgt. Anderson said she did not want Mr. Ortiz at Birch (See ECF No. 119-23 at 45–46). Even so, the purpose of the interview was to consider Mr. Ortiz's out-of-bounds violation. And it is undisputed that a captain oversaw that interview. The disciplinary decision from that hearing—an extra fifteen days on T.R.O. lockdown—was ratified and extended at a hearing four days later, on October 19, 2015, when Officer Finlayson found that Mr. Ortiz was guilty of the out-of-bounds violation and assessed him an additional ten days in punitive isolation.

Other courts have not found retaliation in cases where the defendants were not the decisionmakers. In Anglin v. City of Aspen, 562 F. Supp. 2d 1304 (D. Colo. 2008), in which the plaintiff asserted that the defendants' acts of injecting him with sedation were motivated by the plaintiff's exercise of constitutionally protected conduct, the court determined the plaintiff's "argument lacks merit in the light of the court's finding that [the] [o]fficers … were not authorized and did not make the decision to sedate [the p]laintiff." Id. at 1321. After all, the plaintiff had "not offered any evidence that could support an argument that [the o]fficers … somehow injected themselves into the decisionmaking processes and [the doctor's] decision to sedate [the p]laintiff"; and thus the plaintiff could not "prove the sedation was motivated by how [the o]fficers … might have felt about [the p]laintiff's speech or conduct." Id. (emphasis added); see also Leek v. Miller, 698 F. App'x 922, 926 (10th Cir. 2017) ("Mr. Miller's alleged comment about Mr. Leek and his paperwork bothering someone else was an offhand remark made after the decision to move him had been finalized and was not evidence of retaliatory intent, particularly since Mr. Leek acknowledged that Mr. Miller was not the decisionmaker." (emphasis added));

Cooper v. Ellsworth Corr. Work Facility, No. 93-3102, 1993 U.S. App. LEXIS 20513, at *6 (10th Cir. Aug. 11, 1993) ("Plaintiff's complaint fails to allege that the transferring prison officials were actually motivated by Plaintiff's threat to sue." (emphasis added) (citing Murphy v. Mo. Dep't of Corr., 769 F.2d 506, 503 n.1 (8th Cir. 1985))).

At most, Mr. Ortiz has presented evidence supporting an inference that Sgt. Anderson and Lt. Peterson argued in favor of punishing Mr. Ortiz more harshly due to his grievances. But because it was a captain who oversaw the hearing, and because the punishment that resulted from the hearing was ratified and extended at another hearing four days later, a reasonable jury could not find that Sgt. Anderson and Lt. Peterson caused Mr. Ortiz to be placed on T.R.O. lockdown or transferred to SMU—or, more specifically, that but for their frustrations about Mr. Ortiz's grievances, the disciplinary action would not have taken place.[11]  See Smith, 899 F.2d at 949–50.

The court therefore finds that Mr. Ortiz's retaliation claim against Sgt. Anderson and Lt. Peterson is fatally incomplete due to Mr. Ortiz's failure to dispute Sgt. Anderson and Lt. Peterson's evidence that he did not sustain a "chilling" injury wrought by Defendants.

### D.  Conclusion

The undisputed facts show that Sgt. Anderson and Lt. Peterson were not the ones who took "adverse actions" against Mr. Ortiz, Montgomery, 2019 U.S. Dist. LEXIS 84908, at *13, nor were they the decisionmakers or "transferring prison officials," Anglin, 562 F. Supp. 2d at 1321; Leek, 698 F. App'x at 926; Cooper, 1993 U.S. App. LEXIS 20513, at *6.  Therefore, Mr.

---

[11] As the Tenth Circuit pointed out, it is also notable that Mr. Ortiz and Mr. Cruz were treated equally and that Mr. Ortiz did not pursue his July 29 grievance, giving Sgt. Anderson and Lt. Peterson less of a motive to retaliate two months later.  Ortiz, 857 F. App'x at 431.

Ortiz has not validly asserted that Sgt. Anderson and Lt. Peterson violated his constitutional rights.

## II. Prong Two: Clearly Established Law

Though Mr. Ortiz's failure to carry his burden on prong one is enough to afford Sgt. Anderson and Lt. Peterson qualified immunity, the court addresses prong two as well and concludes that Mr. Ortiz has not met his burden there either. Even if Sgt. Anderson and Lt. Peterson's complaints about Mr. Ortiz's grievances at the T.R.O. meeting rose to the level of a constitutional violation, there is no clearly established precedent to put these Defendants on notice that their statements—even though they were not the decisionmakers—rendered them liable to suit.

### A. Legal Standard

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, 577 U.S. 7, 11 (2015) (per curiam) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" Id. at 12 (quoting al-Kidd, 563 U.S. at 742). The Supreme Court has repeatedly admonished circuit courts "not to define clearly established law at a high level of generality." Kisela v. Hughes, 584 U.S. 100, 104 (2018). And though "a case directly on point" is not required, "existing precedent must have placed the … constitutional question [regarding the illegality of the defendant's conduct] beyond debate." Cummings v. Dean, 913 F.3d 1227, 1239 (10th Cir. 2019), cert. denied sub nom. Cummings v. Bussey, 140 S. Ct. 81 (2019).

"Ordinarily … there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other [circuits] must have found the law to be as the plaintiff maintains." Toevs v. Reid, 685 F.3d 903, 916 (10th Cir. 2012) (citation omitted). The court should not "consider district court opinions in evaluating the legal landscape for purposes of qualified immunity." Ullery v. Bradley, 949 F.3d 1282, 1291, 1300 (10th Cir. 2020) (citations omitted).

## B. Mr. Ortiz's Cases

Mr. Ortiz maintains that the law was clearly established that his First Amendment rights were violated when Sgt. Anderson and Lt. Peterson threatened him with less privileged housing for grieving and were in a meeting discussing his penchant for complaining and grieving, while charges against Mr. Ortiz were being filed—and his move to less privileged housing was being decided—by other UDOC employees who are not defendants here.

To determine if Mr. Ortiz has met his burden of showing that these rights were "clearly established at the time of the defendant's conduct," Ullery, 949 F.3d at 1289, the court has carefully examined Mr. Ortiz's summary judgment opposition (ECF No. 139), reviewing each case Mr. Ortiz cites to show that his rights were "sufficiently clear that every reasonable official would have understood that [Sgt. Anderson and Lt. Peterson's conduct] … violate[d] th[ose] right[s]." Mullenix, 577 U.S. at 11 (quoting Reichle, 566 U.S. at 664); see also Martinez v. Jenneiahn, 2023 U.S. App. LEXIS 17609, at *7 (10th Cir. July 12, 2023) ("Mr. Martinez has presented no Supreme Court or Tenth Circuit case where an officer acting under similar circumstances as [the defendants] was held to have violated [the Constitution], [n]or has he shown that the alleged right is clearly established in other circuits." (cleaned up)).

24

As an initial matter, the court rejects Mr. Ortiz's citation and reliance on <u>Brewer v. Davis</u> <u>Cnty.</u>, No. 1:15-cv-40, 2020 U.S. Dist. LEXIS 95964 (D. Utah June 1, 2020), because it is a federal district court case ineligible for consideration here.  <u>See</u> <u>Ullery</u>, 949 F.3d at 1300 (the court must "decline to consider district court opinions in evaluating the legal landscape for purposes of qualified immunity").

Next, the court reviews the other cases cited by Mr. Ortiz.  Except for the first case, <u>Avance</u>, 491 F. App'x at 1, Mr. Ortiz offers no context, comparison points, or analysis about how the other cases he cites demonstrate that the law is clearly established; in other words, he does not suggest how these cases put Sgt. Anderson and Lt. Peterson on notice that their oral threats about Mr. Ortiz's grievances and discussion of his grievances in a T.R.O. meeting—even though other employees made the ultimate decisions to move Mr. Ortiz to less privileged housing— equated to unconstitutional retaliation.  (ECF No. 139 at 30–35.)  Though Mr. Ortiz did not analyze any of the cases vis-a-vis his facts, the court has carefully reviewed each of the cases.

### 1.  <u>Avance</u>

The court sets out Mr. Ortiz's argument in full about the applicability of <u>Avance</u>, 491 F. App'x at 1:

> In <u>Avance</u>, an inmate submitted a grievance alleging that jail staff placed him in a restrictive setting for submitting a prior grievance.  After submitting his subsequent grievance, the jail guard responded by telling the inmate "You don't know a damn thing about the rules and you don't run a f***ing thing at this jail." The inmate followed up with another grievance and was again placed in a restrictive setting.  These facts, which mostly came from the inmate's own testimony, contributed to overcoming a qualified immunity defense.  <u>See</u> <u>Avance</u>, 491 F. App'x at 4.

> Similar to <u>Avance</u>, Ortiz's disputed facts (argued more fully below) sufficiently support his retaliation claim.  These facts include Peterson's and Anderson's overt threats to Ortiz that he would be moved from Birch for

25

> "complain[ing] too much" through his grievances.  These facts also include placing Ortiz on T.R.O. lockdown and then moving him to the Severe Management Unit—a housing unit with more restrictions.  The move to the Severe Management Unit occurred <u>immediately</u> following his T.R.O. interview where his grievances were the primary topic of discussion.
>
> As experienced prison staff with elevated rank and supervisory responsibilities, Anderson and Peterson must have understood that their actions clearly violated the law.  More particularly, they must have understood that they were retaliating against Ortiz for exercising his constitutional right to submit grievances against prison staff.  Thus, they do not enjoy qualified immunity.

(ECF No. 139 at 29–30.)

But what Mr. Ortiz is missing is a crucial distinction between <u>Avance</u> and his case: The undisputed facts here show that Sgt. Anderson and Lt. Peterson—though they threatened Mr. Ortiz regarding his grievances and were in a T.R.O. interview discussing Mr. Ortiz's grievances—were ultimately not the ones who "plac[ed] Ortiz on T.R.O. lockdown and then mov[ed] him to the Severe Management Unit—a housing unit with more restrictions."  (<u>Id.</u> at 29.)

In <u>Avance</u>, the defendant—the jail administrator—<u>was</u> the one who, immediately after the plaintiff filed a grievance, specifically "order[ed] that [the plaintiff] should be placed in the observation cell and that he should not be provided with any bedding or toiletries."  <u>Avance</u>, 491 F. App'x at 2.  Once the plaintiff was returned to his own cell and filed a grievance about that treatment, the defendant responded to the grievance with the comment about how the plaintiff did not run the jail, after which the plaintiff was placed back in the observation cell for four days.  <u>Id.</u> at 3.  The evidence in <u>Avance</u> showed the defendant "was aware of [the plaintiff's grievance] activities and that he <u>personally</u> made the decision to put him in the observation cell with severe

26

restrictions." <u>Id.</u> at 6 (emphasis added).  For these reasons, the court denied the defendant qualified immunity at summary judgment.  <u>Id.</u> at 7.

Because of these distinctions, <u>Avance</u> is not an "existing precedent" that "place[s] the … constitutional question [regarding the illegality of the defendant[s'] conduct] beyond debate."  <u>Cummings</u>, 913 F.3d at 1239.

### 2.   Other cases cited for general principles only

The other cases Mr. Ortiz cites are cited primarily as support for general principles, with no attempt by Mr. Ortiz to analogize them to the relevant facts or suggest how the facts in these cases would have alerted Sgt. Anderson and Lt. Peterson to the type of liability Mr. Ortiz asserts here—i.e., that although Sgt. Anderson and Lt. Peterson did not authorize the moves to less advantageous housing here, they could nevertheless be held liable for unconstitutional retaliation.  (ECF No. 139 at 30–35.)  These cases each have a parenthetical after them that will make clear how each case is not on point with the crux of Mr. Ortiz's case:

- **<u>Bustillos v. City of Carlsbad</u>**, No. 21-2129, 2022 U.S. App. LEXIS 12407, at *13–14 (10th Cir. May 9, 2022) (granting defendant police officer qualified immunity because allegations that the plaintiff recorded the officer, was told not to, and was then arrested for probable cause defeated the retaliatory arrest claim);

- **<u>Johnson v. Whitney</u>**, 723 F. App'x 587, 589, 594–95 (10th Cir. 2018) (reversing dismissal deeming retaliation claim frivolous because the defendant prison staffer was alleged to have retaliated against the plaintiff for filing a grievance by withholding $1.41 from the plaintiff's inmate account, which was not a <u>de minimis</u> violation in the prison context);

- **Green v. Snyder**, 525 F. App'x 726, 730 (10th Cir. 2014) (granting the defendant prison employee qualified immunity on retaliation allegations when the employee gave the plaintiff the wrong grievance form, causing the plaintiff to miss the grievance deadline, but the plaintiff ultimately suffered no injury because an untimely grievance was not used as a defense against the claim at issue in the grievance);

- **Gee**, 627 F.3d at 1189 (concluding that the plaintiff stated a claim for retaliation after the plaintiff filed grievances and was transferred <u>by defendants</u> to an out-of-state supermax prison, the defendants knew about the grievances concerning the defendants' behavior, and the transfer was close in time to the protected activity);

- **Frazier v. Dubois**, 922 F.2d 560, 561–62 (10th Cir. 1990) (reversing dismissal deeming retaliation claim frivolous based on erroneous conclusion that federal inmates may be transferred at any time for any or no reason);

- **Smith**, 899 F.2d at 945, 949, 951 (reversing summary judgment for the defendant officials when the plaintiff provided sufficient circumstantial evidence to support an inference that the <u>defendant officials initiated</u> disciplinary procedures and harassed the plaintiff to retaliate against the plaintiff for suing the officials);

- **Peterson v. Shanks**, 149 F.3d 1140, 1142, 1144 (10th Cir. 1998) (affirming, based on lack of "but for" cause, a grant of summary judgment to the defendant on the plaintiff's retaliation claim);

- **Milhouse v. Carlson**, 652 F.2d 371, 373–74 (3d Cir. 1981) (reversing dismissal of complaint because the conspiracy allegations, viewed as whole, supported an inference that the defendant officials retaliated against the plaintiff inmate by disciplining him after

the plaintiff brought a civil-rights suit against the officials—with no discussion about whether defendants made the ultimate disciplinary decision), abrogated on other grounds by Mack v. Yost, 968 F.3d 311 (3d Cir. 2020);

- **McDonald v. Hall**, 610 F.2d 16, 18 (1st Cir. 1979) (reversing complaint dismissal when retaliation claim adequately alleged decision to transfer plaintiff inmate was made based on his legal actions against prison officials—with no discussion about whether the defendants made the ultimate transfer decision).

## C. Discussion

None of these cases hold that prison employees—other than the ones making ultimate decisions that place an inmate in less privileged housing—may be held liable for retaliation, when they have only threatened the inmate or discussed (even with the decisionmakers) downgrading the inmate's housing because he filed a grievance.  In other words, these cases do not "involve[] materially similar conduct or appl[y] with obvious clarity to the conduct at issue." Martinez, 2023 U.S. App. LEXIS 17609, at *5 (quoting Lowe v. Raemisch, 864 F.3d 1205, 1208 (10th Cir. 2017)); see also Moses-El v. City & Cnty. of Denver, No. 20-1102, 2022 U.S. App. LEXIS 14847, at *30 n.20 (10th Cir. May 31, 2022) (concluding plaintiff's claims failed on second prong of qualified-immunity analysis when plaintiff cited cases "at too high a level of generality" and the cases were not "factually analogous"); Swanson v. Griffin, 2022 U.S. App. LEXIS 5179, at *7 (10th Cir. Feb. 25, 2022) ("[P]laintiffs may not identify their claim through 'extremely abstract rights' because this would 'convert the rule of qualified immunity … into a rule of virtually unqualified liability.'" (quoting White v. Pauly, 580 U.S. 73, 79 (2017))); Frasier v. Evans, 992 F.3d 1003, 1014 (10th Cir. 2021) ("[T]he precedent must have clearly established

29

the right in light of the specific context of the case, not as a broad general proposition." (citation omitted)).

Although most closely on point (but not directly, as both cases fail to include a discussion about whether the defendants were the decisionmakers), the last two cases—<u>Milhouse</u> and <u>McDonald</u>—carry less weight in the court's analysis because they are from outside the Tenth Circuit.  <u>See</u> <u>Martinez</u>, 2023 U.S. App. LEXIS 17609, at *15 ("[T]wo cases from one other circuit are insufficient to clearly establish the law." (citing <u>Irizarry v. Yehia</u>, 38 F.4th 1282, 1294–95 (10th Cir. 2022))); <u>see also</u> <u>Swanson</u>, 2022 U.S. App. LEXIS 5179, at *7–8 ("[A]lthough Mr. Swanson attempts to rely on out-of-circuit authority to demonstrate that the right he asserts is clearly established under the weight of authority approach, only one of the three out-of-circuit decisions is potentially on-point.  But a plaintiff's identification of a single out-of-circuit case is not sufficient to satisfy the weight of authority approach.").  <u>Milhouse</u> and <u>McDonald</u> are not Supreme Court or Tenth Circuit cases, nor do they alone or together establish that the "weight of authority" would have put these defendants in the Tenth Circuit on notice that certain conduct was unconstitutional.  <u>See</u> <u>Toevs</u>, 685 F.3d at 916.

None of these cases leads this court to conclude that Mr. Ortiz's First Amendment rights were "sufficiently clear that every reasonable official would have understood that what he is doing violates th[ose] right[s.]"  <u>Mullenix</u>, 577 U.S. at 11 (quoting <u>Reichle</u>, 566 U.S. at 664).  "Though a case directly on point is not required, existing precedent must have placed the constitutional question regarding the illegality of the defendant's conduct beyond debate."  <u>Ullery</u>, 949 F.3d at 1291 (cleaned up).  The court therefore finds that Mr. Ortiz has not carried his burden to show that the law was clearly established.

The qualified-immunity inquiry "may appear unduly formalistic … [b]ut this is the task required of [courts] under the qualified-immunity precedents [courts] are obligated to follow." Id. at 1301; see also Lombardo v. City of St. Louis, 143 S. Ct. 2419, 2421 (2023) (Sotomayor, J., dissenting) ("The clearly established prong of the qualified immunity analysis can pose a very high bar for plaintiffs seeking to vindicate their rights.  Even when government officials violate the law, qualified immunity shields them from damages liability unless the violative nature of the particular conduct is clearly established." (cleaned up)).

## CONCLUSION

Mr. Ortiz has not carried his burden under either prong of the qualified immunity analysis.  "A defendant is entitled to qualified immunity if the plaintiff fails to satisfy either prong."  Martinez, 2023 U.S. App. LEXIS 17609, at *5.  Therefore, the qualified immunity doctrine protects Sgt. Anderson and Lt. Peterson from further litigation in this matter.

## ORDER

For the foregoing reasons, the court therefore ORDERS that:

1.      Sgt. Anderson and Lt. Peterson's motion for summary judgment (ECF No. 120) is GRANTED.

2.      Sgt. Anderson and Lt. Peterson are DISMISSED from this action with prejudice on the basis of qualified immunity.

3.      Because no controversy remains, the court directs the Clerk of Court to close this action.

DATED this 30th day of April, 2024.

BY THE COURT:

_____
Tena Campbell
United States District Court